# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### MAY 16, 2006 Session

## BARNEY NEWCOMB v. KOHLER COMPANY

**Direct Appeal from the Circuit Court for Obion County**
**No. 3-233      William B. Acree, Judge**

---

**No. W2005-02161-COA-R3-CV - Filed September 5, 2006**

---

In April 2003, the plaintiff's employer terminated his employment. The employer, citing the company's respectful workplace policy, fired the employee for allegedly cursing a fellow employee. The employee subsequently filed suit against the employer for retaliatory discharge. The employee alleged that his prior workers' compensation claims were the real reason that his employer terminated his employment. In his complaint, the employee sought compensatory and punitive damages, but did not set forth the amount requested. After the jury trial got underway, the trial court allowed the employee to amend his complaint to request a specific amount of damages for back pay and front pay, but ultimately dismissed the claim for punitive damages. At the conclusion of the employee's case-in-chief, the employer moved for a directed verdict, which the trial court denied. At the close of the employer's proof, the jury returned a verdict in favor of the employee finding that his workers' compensation benefits were a substantial factor in the employer's decision to terminate his employment. At the end of trial, the trial court conducted a hearing on the issue of whether to award reinstatement or front pay to the employee. After hearing evidence on the issue, the trial court ordered the employer to pay front pay since reinstatement was not warranted under the facts of the case. The employer presented numerous issues related to the jury trial in its motion for a new trial, which the trial court denied. On appeal, the employer asks us to review (1) the trial court's decision to allow the employee to amend his complaint during the trial; (2) the trial court's decisions regarding the admissibility of certain evidence; (3) the trial court's decision to deny the employer's motion for a directed verdict; (4) the trial court's rejection of the employer's proposed jury instructions; (5) the trial court's decision to affirm the jury's verdict while acting as thirteenth juror; and (6) the trial court's award of front pay in lieu of reinstatement. We affirm the trial court's rulings on the various issues raised by the employer on appeal.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

W. Stephen Gardner, Memphis, TN, for Appellant

David Hardee, Jackson, TN, for Appellee

**OPINION**

**I.**
**FACTUAL BACKGROUND & PROCEDURAL HISTORY**

In 1975, Barney Newcomb ("Newcomb" or "Appellee") began working at a manufacturing facility owned by United States Gypsum, which is located in Union City, Tennessee. Kohler Company ("Kohler" or "Appellant") purchased the facility from United States Gypsum in November of 1988. Over the course of his employment with Kohler and its predecessor, Newcomb suffered several work related injuries for which he received workers' compensation benefits.[1] After each incident, Newcomb returned to work at the Union City facility.

In January 2000, Don Goad became the plant manager for Kohler's Union City facility. After taking control of the plant, Mr. Goad noted that, while the plant had certain policies in place to govern employee conduct, the policies were not being consistently enforced. To remedy the situation, Mr. Goad sought to implement a respectful workplace policy. To further this goal, Mr. Goad held plant-wide meetings with supervisors and employees to discuss workplace conduct. Newcomb attended the meetings at which Mr. Goad presented his respectful workplace policy and his expectations for employees and management.

Kohler's Associate Handbook provides: "Mutual trust and respect are promoted between all elements of the Company and all associates at all times. Kohler is committed to providing a respectful workplace." The Plant Rules of Conduct contained within the Associate Handbook sets forth prohibited conduct, including the following: "Insubordination or use of profane or abusive language toward fellow associates or officials of the Company or persons doing business with the Company." Mr. Goad subsequently stated that this was the provision he tried to enforce with the implementation of his respectful workplace policy. Under the heading Disciplinary Action, the handbook provides:

---

[1] In September 1984, Newcomb injured his back. In April 1990, Newcomb suffered another back injury. In July 1992, Newcomb injured his left elbow. In October 1999, Newcomb injured his left ankle. In each instance, Newcomb filed a lawsuit against his employer for workers' compensation benefits, which resulted in either a settlement or judgment in his favor.

When disciplinary action is warranted, in cases other than attendance or quality, it will normally be as follows:

- Verbal warning
- Written warning
- Written warning and meeting with area manager
- Final warning/supervisor
- Termination

The objectives of this procedure are to establish a uniform procedure for handling violation of rules, policies, procedures, and situations involving unsatisfactory/unacceptable job performance. Exceptions to this procedure may be warranted, as it is not possible to write one that covers every situation. As noted, termination may be warranted for the first serious offense. Some examples are theft, destruction of property, fighting, walking off the job, making threats, or any other act deemed to be a substantial breach of reasonable associate conduct.

The Associate Handbook does not contain a provision specifically designated "Respectful Workplace Policy," and the handbook was never amended to expressly set forth Mr. Goad's policy.

Prior to 2001, Newcomb had never received a written reprimand for conduct violations. On April 12, 2001, Newcomb received a written warning after his supervisor received a complaint from two female co-workers alleging that he "was touching them on the arms, in the side, and trying to hold their hand." Newcomb subsequently admitted to "holding a girls hand." The written warning advised Newcomb that such conduct would not be tolerated and that "any further complaints of this nature could result in further disciplinary action up to and including suspension until which time the complaint can be investigated." The warning did not, however, state that his conduct violated Kohler's respectful workplace policy, and Newcomb was not suspended. In August 2001, Newcomb received a quarterly performance review advising him that he "needs to be more respectful toward fellow workers." Newcomb received another quarterly performance evaluation in November 2001, which stated: "Sometimes pays more attention to getting the job done than showing respect toward his fellow associates."

On April 2, 2003, James Bridges, one of Newcomb's fellow co-workers, was finishing the third shift at the facility. When Newcomb arrived for the first shift, he and Mr. Bridges began discussing what Mr. Bridges perceived to be Newcomb's failure to perform his share of the work responsibilities. According to Bridges, Newcomb responded to the accusations by saying "f - - - you, Bridges." According to Newcomb, he said "To heck with you, James Bridges," and he never used profanity. Tereca Mason, another employee, witnessed the exchange. Mr. Bridges reported the incident to his third-shift supervisor, Tommy Stanford, who in turn reported the incident to Buddy Thompson, his immediate supervisor. Mr. Stanford then instructed Newcomb to report to Mr.

Thompson's office where Newcomb denied cursing Mr. Bridges. At the conclusion of the meeting, Mr. Thompson suspended Newcomb pending further investigation of the incident.

Chris Moore assumed the position of manufacturing manager for Kohler's Union City facility in October 2002 with responsibility for all manufacturing operations at the plant. On the morning of April 2, 2003, Mr. Thompson informed Mr. Moore of the incident between Mr. Bridges and Newcomb, and Mr. Moore decided to interview Mr. Bridges and Ms. Mason the following morning, April 3, 2003. Also on the morning of the incident, Mr. Stanford told Mr. Moore that he believed that Newcomb had a prior violation of the company's respectful workplace policy. Later in the day on April 2, 2003, Newcomb called Mr. Moore to give him his version of the incident. During their conversation, Newcomb never mentioned that he previously had filed workers' compensation claims against the company.

According to Mr. Moore, he and Mr. Thompson met with Mr. Bridges and Ms. Mason on the morning of April 3, 2003. After the meeting, Mr. Thompson provided a written statement recounting his version of events, which included Newcomb's use of profanity. Ms. Mason also provided a written statement corroborating Mr. Bridges' version of events. Ms. Mason subsequently stated that Mr. Stanford asked her to give a written statement immediately after the incident on April 2, 2003 and that she did not discuss what happened with anyone else in management.

Since the company was without a human resources manager at the time, the responsibility for handling such matters apparently fell to Mr. Moore. After obtaining the statements from Mr. Bridges and Ms. Moore, Mr. Moore stated that he proceeded to search Newcomb's personnel file looking for any previous violations of the company's respectful workplace policy. Jerry Ray, the previous human resources manager, resigned in 2003 before the incident took place. During his tenure at the facility, Mr. Ray was responsible for maintaining the employees' personnel files, medical files, and workers' compensation files, which were kept separate from each other in the office at the plant. Some of these files contained copies of accident reports, work-related investigations, medical reports, and lawsuits filed against the company. As the human resources manager at the Union City facility, Mr. Ray was aware of the fact that Newcomb had filed workers' compensation claims against the company, but he stated that he did not discuss Newcomb's termination with Mr. Moore, Mr. Stanford, or Mr. Thompson. Mr. Moore stated that, while he assumed he had access to the other files, he confined his search to Newcomb's personnel file and did not search through Newcomb's workers' compensation file or medical file. Mr. Moore also stated that, at the time of the incident, he had no prior knowledge of any workers' compensation claims filed by Newcomb and that no one informed him of any such claims.

After scanning Newcomb's personnel file, Mr. Moore located the previous written warning issued to Newcomb. At that point, he made the decision to terminate Newcomb's employment due to what he perceived to be a second violation of the company's respectful workplace policy. According to Mr. Moore, Kohler's practice was to suspend an employee for three days and provide a written warning for a first violation of the respectful workplace policy followed by termination for a second violation. Mr. Moore could not recall how he came to learn of the practice, and he admitted

that the practice was not set forth in the Associate Handbook. Mr. Moore described the five-step process in the Associate Handbook as a "performance process" that deals with productivity, quality, and attendance issues that is used in "some situations." Further, he stated that Newcomb was the first employee he fired for violating the respectful workplace policy. According to Mr. Moore, the decision to terminate Newcomb was his alone. Mr. Goad left the Union City facility in the summer of 2001 to accept a position overseeing six other Kohler plants. At the time of the incident involving Mr. Newcomb, Jim Kraft held the role of plant manager. Mr. Moore notified Mr. Kraft of his decision to terminate Newcomb, which Mr. Kraft affirmed. On April 3, 2003, Mr. Moore called Newcomb and asked him to report to the office the following morning, April 4, 2003. When Newcomb arrived at the facility on April 4, 2003, Mr. Moore informed him that his employment with the company had been terminated.

Following his termination, Newcomb sent a letter to Kohler's headquarters to express his grievances about the manner in which he was terminated. In the letter, Newcomb complained that other employees had committed sexual harassment or used profane language but were not terminated. His letter did not state, however, that he felt that his prior workers' compensation claims were somehow related to his termination. Newcomb also called Mr. Goad at his new office in Wisconsin to ask if he could help with his termination. Mr. Goad called Mr. Kraft and discussed Newcomb's termination, but Mr. Goad subsequently informed Newcomb that he would not reverse the decision.

On July 7, 2003, Newcomb filed a lawsuit against Kohler in the Circuit Court of Obion County alleging retaliatory discharge and breach of contract. Regarding his retaliatory discharge claim, Newcomb alleged that Kohler used his prior workers' compensation claims as a substantial factor in deciding to terminate his employment. As for the breach of contract claim, Newcomb alleged that Kohler failed to follow the disciplinary procedures set forth in the Associate Handbook when it terminated his employment.[2] Further, Newcomb sought compensatory and punitive damages and asked that a jury be empaneled to try his case. The trial court subsequently allowed Newcomb to amend his complaint to allege that Kohler retaliated against him by also failing to promote him. Kohler filed an answer to each complaint denying liability. In its amended answer, Kohler noted that the amended complaint failed to specify a dollar amount for compensatory and punitive damages and, therefore, sought to bar Newcomb from recovering such damages.

Thereafter, the parties proceeded to mediate the dispute, but they were unable to reach a settlement in the case. Kohler subsequently filed a motion for judgment on the pleadings to challenge Newcomb's claim that Kohler retaliated against him by failing to promote him. The trial court ultimately granted the motion and dismissed this aspect of Newcomb's complaint. Kohler also filed a motion in limine asking the trial court to exclude certain opinion testimony and evidence

---

[2] The record contains an excerpt from the lower court's trial docket indicating that Kohler moved for summary judgment on Newcomb's breach of contract claim, which the trial court granted. Other than the court's notation in the docket, no such motion or an order disposing of such motion can be found in the record before this Court. In any event, the record reveals that the breach of contract claim was not presented to the jury for consideration.

related to Newcomb's workers' compensation claims as well as any evidence regarding promotions. Shortly thereafter, Kohler filed fifteen (15) proposed jury instructions with the trial court relating to various aspects of the case.

The jury trial commenced on April 12, 2005. During its opening statement, Kohler moved to renew its motion in limine to exclude evidence related to Newcomb's workers' compensation claims and evidence that Newcomb did nor did not receive a promotion or transfer following the filing of a workers' compensation claim. The trial court denied the renewed motion but granted Kohler a standing and continuing objection to any evidence offered along these lines at trial.[3]

During the trial, Newcomb asked the trial court to allow him to amend his complaint once more to specify a specific dollar amount of damages. The trial court allowed Newcomb to amend his complaint to allege a specific amount of damages for back pay and front pay, but the court took the request to amend the complaint to request a specific amount of punitive damages under advisement. Specifically, Newcomb requested $57,321.08 in back pay and $429,908.10 in front pay. During the proceedings on April 13, 2005, the trial court rejected Kohler's proposed jury instructions.

At the conclusion of Newcomb's case-in-chief, Kohler moved for a directed verdict. The trial court ruled that there was sufficient evidence to allow the retaliatory discharge claim to go the jury, but the court took the issue of punitive damages under advisement until the close of all the proof in the case. At the conclusion of the presentation of all evidence, Kohler renewed its motion for directed verdict. The trial court denied the motion as to the retaliatory discharge claim, but the court ruled that there was insufficient evidence to warrant presenting the issue of punitive damages to the jury.

On April 14, 2005, the parties presented their closing arguments to the jury, and the trial judge charged the jury with instructions selected by the court. After the jury began its deliberations, the trial court held a hearing on whether to award Newcomb front pay or to award reinstatement and took the matter under advisement. At the hearing, Kohler offered to reinstate Newcomb, and the trial court took the offer under advisement as well. After deliberating, the jury returned a verdict in favor of Newcomb finding that "[t]he plaintiff's filing of a workers' compensation claim was a substantial motivating factor in the defendant's discharge decision." In turn, the jury awarded Newcomb compensatory damages for back pay in the amount of $57,321.08.

On May 3, 2005, the trial court entered judgment for Newcomb on the jury's award of compensatory damages for back pay. That same day, the trial court entered an order finding that reinstatement was not warranted in this case and ordered Kohler to pay Newcomb damages for front pay in the amount of $335,776.00. On May 17, 2005, the trial court entered a final judgment in the case memorializing the damage awards. Thereafter, Kohler filed a post-trial motion, which included,

---

[3] The trial court also entered an order post-trial denying Kohler's written motion in limine.

among other things, a motion for a new trial and a renewed motion for a directed verdict. The trial court subsequently denied the motions, and Kohler filed a timely notice of appeal to this Court.

## II.
### ISSUES PRESENTED FOR REVIEW

Kohler has presented the following issues for this Court's review:

1.      Whether the trial court erred when it allowed Newcomb to amend his complaint during the trial;
2.      Whether the trial court erred when it allowed certain evidence to be submitted to the jury;
3.      Whether the trial court erred when it denied Kohler's motion for a directed verdict at the conclusion of Newcomb's case-in-chief and its renewed motion at the conclusion of the case;
4.      Whether the trial court erred when it rejected Kohler's proposed jury instructions;
5.      Whether the trial court erred in performing its role as the thirteenth juror; and
6.      Whether the trial court erred in awarding Newcomb front pay instead of reinstatement.

For the reasons set forth more fully herein, we affirm the decisions of the trial court.

## III.
### DISCUSSION

### A.
### *Amendment of the Complaint During Trial*

In his original complaint and first amended complaint, Newcomb stated: "the plaintiff demands judgment against the defendant for compensatory and punitive damages in such amounts that are fair and just, a jury to try his cause and for general relief." In its answer to the first amended complaint, Kohler raised the following as an affirmative defense: "The Amended Complaint fails to specify a dollar amount sought for compensatory damages and punitive damages and, therefore, Plaintiff is barred from receiving such damages." No further mention of the absence of an amount of damages was made by either party until after the trial began. When Newcomb began to testify about his lost earnings, counsel for Kohler interrupted and directed the trial court's attention to the fact that the ad damnum clause[4] in the complaint failed to request an amount of damages. Counsel for Newcomb responded by moving to amend the complaint. The trial court permitted the amendment, and Newcomb sought $57,321.08 in back pay and $429,908.10 in front pay.

---

[4] The "ad damnum clause" is "[a] clause in a prayer for relief stating the amount of damages claimed." BLACK'S LAW DICTIONARY 38 (7th ed. 1999).

On appeal, Kohler argues that the trial court erred when it allowed Newcomb to amend his complaint during trial to request a specific amount in damages. Kohler maintains that it was prejudiced by the amendment, as it deprived Kohler of the opportunity to conduct discovery on the damages issue. Accordingly, Kohler asks this court to remand the case to the trial court for a new trial.

"Wrongful termination almost always economically harms the person fired." *Lowrimore v. Certified Indus., Inc.*, No. M1998-00938-COA-R3-CV, 2001 Tenn. App. LEXIS 507, at *10–11 (Tenn. Ct. App. July 19, 2001). "In these cases, courts are invariably faced with two issues: (1) how to compensate a plaintiff for past injuries — those occurring between the date of the discharge and the date of trial; and (2) how to compensate for future injuries — those occurring after the trial." *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 331 (Tenn. 1996). It has been well-established by our case law that front pay and back pay are designed to make the wrongfully terminated employee whole. *Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 432–34 (Tenn. Ct. App. 1992).

Tennessee Rule of Civil Procedure 8 sets forth the general rules of pleading and provides that a claim for relief "shall contain . . . a demand for judgment for the relief the pleader seeks." TENN. R. CIV. P. 8.01 (2005). Items of special damage, however, must be specifically pled. TENN. R. CIV. P. 9.07 (2005). Thus, "[i]n pleading damages a distinction must be made between such damages as are commonly designated general damages and those known as special damages." 25 C.J.S. *Damages* § 225 (2002). General damages are those "which are the natural and necessary result of the wrong complained of." *Id.* Special damages are "those damages which are the natural but not necessary result of the wrong." *Id.*; *accord Mitchell v. Mitchell*, 876 S.W.2d 830, 831 (Tenn. 1994) (quoting *Lance Prod. v. Commerce Union Bank*, 764 S.W.2d 207, 213 (Tenn. Ct. App. 1988)). Neither party cites this Court to any authority holding that awards of front pay and back pay constitute special damages that must be specifically pled. Nor do they cite to any authority holding that the ad damnum clause must set forth an amount of the damages requested.

Front pay and back pay naturally result from an employer's wrongful termination of an employee for filing a workers' compensation claim and are designed to make the employee whole. *See Sasser*, 839 S.W.2d at 432–35. As such, they are not an item of special damages which must be specifically pled in the complaint. This does not mean, however, that the employee may omit the amount of damages requested from his complaint entirely and ask the jury to award whatever amounts it deems just. The purpose for seeking damages in a lawsuit can be summarized as follows:

> In its legal sense the word "damages" is defined as meaning the compensation which the law will award for an injury done, a compensation, restitution, recompense, or satisfaction *in money* for a loss or injury sustained or suffered, or compensation for actual injury. "Damages" are the measure of the loss or harm, *generally in the form of pecuniary compensation*, resulting from an injury suffered by a person because of the unlawful act, omission, or negligence of

another. It is the word which expresses *in dollars and cents* the injury sustained by a plaintiff.

There are two aspects to the word "damages," causation and *amount*. The word "damages" connotes the character of relief afforded to an injured party for the injury suffered, that is, *the amount* which will compensate the injured party for all detriment which was proximately caused by the unlawful act of defendant. It signifies compensation for the default of the party charged therewith, and includes special, as well as general, damages, and all factors going to make up the total amount which plaintiff may recover under correct principles of law.

25 C.J.S. *Damages* § 1 (2002) (emphasis added); *see also* BLACK'S LAW DICTIONARY 393 (7th ed. 1999) (defining "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury").

Our case law establishes that, absent a statute or rule of law to the contrary, a plaintiff is prohibited from recovering money damages in excess of the amount sought in the compliant. *Romine v. Fernandez*, 124 S.W.3d 599, 605–06 (Tenn. Ct. App. 2003); *Cross v. City of Morristown*, No. 03A01-9606-CV-00211, 1996 Tenn. App. LEXIS 677, at *9 (Tenn. Ct. App. Oct. 22, 1996) (citing TENN. R. CIV. P. 15.02); *accord* 25 C.J.S. *Damages* § 253 (2002). Logic dictates, therefore, that a plaintiff who requests nothing is entitled to nothing. *See* 25 C.J.S. *Damages* § 220 (2002) (noting that a plaintiff's complaint "must ordinarily set out the amount of damage sustained in a definite amount"); *Id.* § 221 (stating that "it is unnecessary, in most cases where the demand is unliquidated and sounds wholly in damages, and where there is but a single cause of action, to state specifically, and in amounts, the different elements or items which go to make up the sum total of the damages; it is enough to claim so much in gross damages for the wrong done"). Thus, Newcomb was required to set forth in his complaint the amount of damages he sought to recover from Kohler.

We now turn to the issue of whether the trial court erred by allowing Newcomb to amend his complaint during the trial to set forth an amount of damages for front pay and back pay. Given the timing of the proposed amendment, Newcomb was required to seek leave of court to amend his complaint. TENN. R. CIV. P. 15.01 (2005). The rule provides that "leave shall be freely given when justice so requires." *Id.* "Tennessee law and policy have always favored permitting litigants to amend their pleadings to enable disputes to be resolved on their merits rather than on legal technicalities." *Hardcastle v. Harris*, 170 S.W.3d 67, 80 (Tenn. Ct. App. 2004). "The granting or denying of a motion to amend is within the sound discretion of the trial court and will be reversed only for an abuse of discretion." *March v. Levine*, 115 S.W.3d 892, 908 (Tenn. Ct. App. 2003); *Harden v. Danek Med., Inc.*, 985 S.W.2d 449, 454 (Tenn. Ct. App. 1998).

In exercising its discretion, the trial court should consider several factors, including: (1) whether undue delay will occur as a result of the amendment, (2) whether the opposing party has sufficient notice, (3) whether the amending party is acting in bad faith, (4) whether the moving party

has failed to cure deficiencies in previous amendments, whether the opposing party will suffer undue prejudice, and (5) the futility of the amendment. *Gardiner v. Word*, 731 S.W.2d 889, 891–92 (Tenn. 1987); *Merriman v. Smith*, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979). "Of these factors, the most important is the proposed amendment's potential prejudicial effect on the opposing party." *Hardcastle*, 170 S.W.3d at 81.

When granting Newcomb's motion to amend his complaint, the trial court described Kohler's objection as an "ambush" and questioned why, despite filing numerous motions to address other issues, Kohler never brought the matter to the court's attention prior to trial. As Newcomb's complaint set forth a cause of action for retaliatory discharge premised upon his alleged termination for filing workers' compensation claims, the state of the law is such that Kohler is expected to know that front pay and back pay are commonly sought by plaintiffs in such actions. *See Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 331–32 (Tenn. 1996); *Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 432–35 (Tenn. Ct. App. 1992). Moreover, while the trial court apparently overlooked the statement in Kohler's answer, Kohler easily could have brought the matter to the court's attention prior to trial when a resolution of the issue was not forthcoming.

Kohler's contention that it was prejudiced by the amendment because it was unable to conduct additional discovery is without merit. "When the trial court grants a motion to amend, the opposing party must request a continuance if it believes it has been prejudiced." *Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 22 (Tenn. Ct. App. 1993). When faced with the proposed amendment to Newcomb's complaint, Kohler never requested a continuance to conduct additional discovery. "If a continuance is not requested, the party against whom the amendment was granted may not complain on appeal." *Id.* Accordingly, we hold that the trial court did not abuse its discretion in permitting Newcomb to amend his complaint during the trial to assert a specific monetary amount of damages.

### B.
### *Admissibility of Certain Evidence*

During the trial, Kohler attempted to prove that Mr. Moore was the only person involved in terminating Newcomb and that he had no knowledge of Newcomb's prior workers' compensation claims when he made his decision. Kohler, in essence, takes issue with several items of evidence offered by Newcomb at trial by arguing that such evidence was not admissible for purposes of proving that Newcomb's workers' compensation claims were a substantial factor in Mr. Moore's decision to terminate his employment. In its motion in limine, Kohler asked the trial court to exclude certain evidence, which includes the evidence at issue in this appeal. The trial court denied the motion. When Kohler renewed its motion at the opening of the trial, the trial court again denied the motion. The trial court did, however, grant a standing objection to such evidence during the trial. Kohler has preserved the evidentiary issues for appellate review by raising them in his motion for a new trial. TENN. R. APP. P. 3(e) (2005).

The admissibility of evidence at trial is within the sound discretion of the trial court, and we will not overturn a trial court's decision to admit or exclude evidence without finding a clear abuse of discretion on the part of the trial judge. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442–43 (Tenn. 1992). Having set forth the standard to guide or analysis of these issues, we proceed to examine the evidentiary issues raised by Kohler on appeal.

### 1.
### Evidence of Failure to Promote

Kohler argues that the trial court erred by allowing Newcomb to present evidence of its failure to promote him after his on-the-job injuries. In his amended complaint, Newcomb alleged failure to promote as an additional component of his retaliatory discharge claim. The trial court subsequently dismissed this claim pursuant to Kohler's motion.

At trial, Newcomb testified that, with the exception of one promotion, he tried to apply for higher paying jobs after he returned to work following his injuries but never received a promotion. Kohler objected to this testimony, but the trial court ruled that it was relevant to the discharge issue. Newcomb also recounted, over Kohler's objection, that George Rogers, Newcomb's supervisor for several years, told him that he would never advance because he had sued the company. Roger Gordon, one of Newcomb's other supervisors for several years, testified, over Kohler's objection, concerning his difficulty in getting Newcomb promoted. On appeal, Kohler argues that this evidence is not relevant to whether Moore terminated Newcomb for filing workers' compensation claims against the company. We disagree.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TENN. R. EVID. 401 (2005). Newcomb had the burden of proving that his workers' compensation claims were a substantial factor in Kohler's decision to terminate his employment. One method of meeting this burden is to present circumstantial evidence of management's expression of a negative attitude toward an employee's injured condition. *Flint Constr. Co. v. Hall*, 904 So.2d 236, 248 (Ala. 2004). While Newcomb's claim for retaliation based on failure to promote had been dismissed, the aforementioned evidence remained relevant to Newcomb's attempts to prove an essential element of his cause of action. Accordingly, we hold that the trial court did not err in admitting this evidence.

### 2.
### Remote Evidence

Newcomb also presented the testimony of a present Kohler employee who stated that, when Newcomb suffered his back injury in the 1980s, he returned to a "lesser" job. This witness also testified that his supervisors at the time made derogatory remarks about the fact that he had been injured and sued the company. Kohler objected to this testimony as being too remote in time. Kohler argues that any statements or events occurring prior to Newcomb's last workers'

compensation claim in 1999 have no probative value as to whether they motivated Mr. Moore to fire Newcomb. Consistent with its argument that Mr. Moore was the sole decision maker in this case, Kohler maintains that any events occurring before Mr. Moore came to the plant are not relevant.

George Rogers, one of the supervisors who allegedly made the remarks and one of Kohler's own witnesses, has been at the plant for the past thirty-one years and was Newcomb's supervisor when he injured his back in the 1980s. He testified that only the plant manager could fire an employee and that numerous members of management participate in a termination decision. While Mr. Moore testified that the decision to terminate Newcomb was his alone, he also stated that he sought the plant managers' approval of his decision. As this evidence raises the issues of whether others participated in the termination decision and their level of knowledge concerning Newcomb's prior workers' compensation claims, the aforementioned evidence is relevant to establishing management's level of animosity toward Newcomb beginning with his first on-the-job injury. Accordingly, we find no error in the trial court's decision to admit this evidence.

**3.**
**Evidence of "Common Knowledge" at the Plant**

As previously mentioned, Roger Gordon, a member of management at the Kohler facility until he left in 2001, testified for Newcomb at trial. Mr. Gordon stated, over Kohler's objection, that when someone is injured at the plant, everyone at the plant knew about it. Linda Madrey, who left Kohler in April 2004, also testified for Newcomb. She stated, over Kohler's objection, that other employees told her of Newcomb's injuries and that his injuries were "common knowledge" at the plant. Kohler argues that such testimony constitutes hearsay and is not relevant to proving that Mr. Moore, the sole decision maker, knew of Newcomb's workers' compensation claims.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TENN. R. EVID. 801(c) (2005). A "statement" can be an oral assertion, and a "declarant" is the person making the statement. TENN. R. EVID. 801(a),(b) (2005). "Hearsay is not admissible except as provided by [the Tennessee Rules of Evidence] or otherwise by law." TENN. R. EVID. 802 (2005). In overruling Kohler's hearsay objection to Ms. Madrey's testimony, the trial court held that her testimony did not go to the truth of the matter asserted, therefore, it was not hearsay. In order to determine whether these statements constitute hearsay, we must discern the purpose for which they were offered.

The parties cite to no analogous cases to guide our evaluation of this evidence. In conducting our own independent research, we have located a factually similar case from the United States Court of Appeals for the Tenth Circuit. In *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1295 (10th Cir. 1998), the plaintiff began to experience pain in his shoulder, arm, and back while employed with the defendant in May 1992. After seeing a doctor, the plaintiff was restricted to light duty. *Id.* Thereafter, the plaintiff testified that his supervisors began to mistreat him by writing him up for disciplinary infractions without explaining the substance of the violations. *Id.* The supervisors denied mistreating the plaintiff, asserting that each disciplinary infraction was related to the plaintiff's

failing job performance. *Id.* In December 1992, the plaintiff was driving cattle into a chute by utilizing a cattle prod. *Id.* One of the cattle slipped in the chute, apparently due to snow and mud buildup, causing the line of cattle to halt for five minutes. *Id.* The supervisors alleged that the plaintiff over-shocked the cow causing the cow to slip and fall and that they previously had warned the plaintiff about over-shocking cattle. *Id.* The plaintiff denied ever receiving prior warnings. *Id.*

Following the December 1992 incident, a supervisor issued a written disciplinary report to the plaintiff, which noted two previous written warnings. *Id.* at 1296. Citing this most recent written infraction, the defendant's personnel manager decided to terminate the plaintiff's employment. *Id.* Thereafter, the plaintiff filed suit against the defendant alleging retaliatory discharge. *Id.* The defendant filed a motion in limine to exclude, among other things, evidence that its personnel directors had heard complaints from other employees to the effect that the defendant mistreated its employees following work-related injuries. *Id.* The trial court made a preliminary ruling excluding the evidence, but the court allowed the plaintiff's counsel to question the terminating official about his knowledge of other employee's complaints. *Id.* The official testified that he had heard complaints from employees about the defendant's practice of harassing and mistreating injured employees. *Id.*

On appeal, the defendant argued that the trial court erred by allowing this testimony over its hearsay objection. *Id.* at 1297. Specifically, the defendant argued that such testimony "was hearsay, impermissible character evidence and irrelevant." *Id.* In addressing these contentions, the court of appeals stated:

> We reject [the defendant's] contention that mistreatment of other employees in similar circumstances is irrelevant and prejudicial. Because an employer will rarely admit retaliatory motives in firing an employee, retaliatory discharge cases generally must be proven by circumstantial rather than direct evidence. *See Chaparro v. IBP, Inc.*, 873 F. Supp. 1465, 1472 (D. Kan. 1995).
>
> We also reject [the defendant's] assertion that other employee's complaints constitute impermissible character evidence. Evidence of prior acts is generally not admissible to prove the character of a person or to show the person acted in conformity therewith. Fed. R. Evid. 404(b). However, character evidence is admissible in civil trials to show motive or intent. *Id.*; *see also Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990). The evidence here was offered to show that [the defendant] had the motive or intent to mistreat employees following their work-related injuries and we find no error in its admission.
>
> . . . .

At trial, the district court admitted the evidence despite stating the evidence was "probably hearsay." III App. at 583-85. In its post-trial order denying [the defendant's] motion for a new trial, the district court ruled that the evidence of the employees' complaints that they were harassed and mistreated following injuries or claims for medical benefits was not hearsay because it was being *offered to show that the* [*defendant's*] *personnel directors heard complaints.* I App. at 171. The judge's order stated that testimony by a witness that he heard or received complaints is "not hearsay, in that it is not a statement made by an out-of-court declarant. Fed. R. Evid. 801(c)." I App. at 171. We cannot agree. We feel it is clear that the "complaints" which were admitted over hearsay objections were offered not to prove the mere hearing or making of them; their purpose was to establish the proposition in the jury's mind that [the defendant] in fact engaged in a pattern or practice of mistreating its employees after work-related injuries. As such, the out-of-court statements were inadmissible hearsay under Rule 801(c). *See Winans v. Rockwell Int'l Corp.*, 705 F.2d 1449, 1456-57 (5th Cir. 1983); *Cornelius v. Hondo, Inc.*, 843 F. Supp. 1243, 1246 (N.D. Ill. 1994).

*Id.* (emphasis added).

As did the court in *Sanjuan*, we likewise hold that the testimony at issue in this case is relevant circumstantial evidence tending to prove Newcomb's retaliatory discharge claim. Through the testimony at issue, Newcomb attempted to prove that Kohler's management, and in particular Mr. Moore, knew of Newcomb's workers' compensation injuries since his injuries were "common knowledge" at the plant. Despite its relevancy, however, it constitutes inadmissible hearsay, and the trial court erred in admitting the testimony over Kohler's objection.

Our inquiry does not end at this point. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." TENN. R. APP. P. 36(b) (2005). "The improper admission of evidence that is merely cumulative on matters shown by other admissible evidence[5] may be harmless error." *McClure v. Mexia Indep. Sch. Dist.*, 750 F.2d 396, 402 (5th Cir. 1985); *see also McCue v. Kansas*, 165 F.3d 784, 791 (10th Cir. 1999); *Owens v. Univ. Club of Memphis*, No. 02A01-9705-CV-00103, 1998 Tenn. App. LEXIS 688, at *47–48 (Tenn. Ct. App. Oct. 15, 1998). We hold that the admission of this testimony constitutes harmless error.

**4.**

_____

[5] We will discuss the additional evidence in the record more fully *infra*.

-14-

**Evidence of Union Activity**

At trial, several witnesses testified, over Kohler's objection, concerning an alleged incident involving a Kohler employee who cursed after a meeting to discuss union activities. Kohler argues that the witnesses referenced a union when testifying about another employee's expletive, presumably about the union. Kohler maintains that, since Kohler is a non-union facility, references to a union prejudiced the jury in the event that some of the jurors were union members and sought to hold Kohler's non-union status against the company. Newcomb argues that any reference to a union during the testimony was necessary in order to put the incident in context and that any prejudice to Kohler did not outweigh the probative value of the evidence. *See* TENN. R. EVID. 403 (2005). We agree, and we hold that the trial court did not err in admitting this testimony.

## C.
### Directed Verdict

"With significant exceptions, an employee or an employer may terminate an employment-at-will relationship at any time, with or without good cause." *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995) (citing *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994); *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 555 (Tenn. 1988)). In *Clanton v. Cain-Sloan Company, Inc.*, 677 S.W.2d 441, 445 (Tenn. 1984), our supreme court announced that an employee at will who is discharged for filing a workers' compensation claim has a cause of action for retaliatory discharge against his or her employer. Thus, an employee's ability to file a retaliatory discharge claim when his or her employment is terminated for filing a workers' compensation claim is recognized as a narrow exception to the employment at will doctrine. *See Burns v. Schuller Int'l, Inc.*, No. 03A01-9502-CV-00068, 1995 Tenn. App. LEXIS 439, at *7 (Tenn. Ct. App. June 30, 1995); *Abraham v. Cumberland-Swan, Inc.*, No. 01A01-9201-CH-00032, 1992 Tenn. App. LEXIS 739, at *9 (Tenn. Ct. App. Aug. 28, 1992).

In order to establish a cause of action for termination of employment in retaliation for filing a workers' compensation claim, the plaintiff bears the burden of proving the following elements:

> (1) The plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment.

*Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993). If, and only if, the employee presents a prima facie case of retaliation, then the burden shifts to the employer to prove a legitimate, non-pretextual reason for discharging the employee. *Id.* at 559; *see also Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 426–27 (Tenn. Ct. App. 1992).

Kohler argues that the trial court erred in failing to grant its motion for a directed verdict on Newcomb's claim for retaliatory discharge, which it filed pursuant to Tennessee Rule of Civil Procedure 50.01 at the close of Newcomb's case-in-chief and renewed at the end of the trial. When the trial judge denied the motion at the end of the trial, he reiterated the testimony of the witnesses and stated:

> Having said all of that, the Court finds that the Plaintiff has demonstrated that the reason given by the Defendant [for terminating the Plaintiff] could be a pretext. And in view of all that, the Court finds that the Plaintiff is entitled to go forward to the Jury and have the Jury determine liability in this case, and whether or not the Plaintiff is entitled to back pay.

Kohler does not argue that Newcomb failed to prove the first three elements of his retaliatory discharge claim. Instead, Kohler argues that the record contains no evidence allowing the jury to conclude that Kohler used Newcomb's prior workers' compensation claims as a pretext for terminating his employment.

"A directed verdict is appropriate only when the evidence is susceptible to but one conclusion," *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000) (citing *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Long v. Mattingly*, 797 S.W.2d 889, 892 (Tenn. Ct. App. 1990)), or "when the evidence is insufficient to create an issue for the jury to decide," *Plunk v. Nat'l Health Investors, Inc.*, 92 S.W.3d 409, 413 (Tenn. Ct. App. 2002). When conducting a review of a trial court's denial of a directed verdict, we adhere to the following:

> The rule for determining a motion for directed verdict requires the trial judge and the appellate courts to look to all of the evidence, take the strongest, legitimate view of the evidence in favor of the opponent of the motion and allow all reasonable inferences from it in his favor. The court must disregard all countervailing evidence and if there is then any dispute as to any material, determinative evidence or any doubt as to the conclusions to be drawn from the whole evidence, the motion must be denied.

*Crain v. Benton*, 823 S.W.2d 187, 195 (Tenn. Ct. App. 1991) (citing *Maddux v. Cargill, Inc.*, 777 S.W.2d 687, 691 (Tenn. Ct. App. 1989)). "The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Eaton*, 891 S.W.2d at 590.

We do not conduct a de novo review of the evidence, *see Alexander*, 24 S.W.3d at 271, re-weigh the evidence, *Plunk*, 92 S.W.3d at 412, or re-evaluate the credibility of the witnesses, *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638–39 (Tenn. Ct. App. 1993). If reasonable persons could draw conflicting conclusions from the facts presented in a case, then the jury's verdict cannot

be supplanted by granting a directed verdict. *Plunk*, 92 S.W.3d at 413. Thus, "[i]f there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied." *Eaton*, 891 S.W.2d at 590.

Kohler argues that Newcomb failed to present a prima facie case of retaliation because he failed to offer any proof to allow a reasonable jury to conclude that his claims for workers' compensation benefits were a substantial factor in Kohler's decision to terminate his employment. At trial, Mr. Moore testified that the decision to terminate Newcomb was his alone. Mr. Moore also stated that, at the time of his decision to terminate Newcomb, he had no knowledge that Newcomb previously had filed workers' compensation claims against the company. Kohler maintains that Newcomb offered no evidence tending to contradict Mr. Moore's testimony, therefore, the trial court erred by denying its motion for directed verdict allowing the retaliatory discharge claim to proceed to the jury.

"Proof of discharge without evidence of a causal relationship between the claim for benefits and the discharge does not present an issue for the jury." *Anderson*, 857 S.W.2d at 558–59; *see also Traylor v. N. Am. Royalties, Inc.*, No. E1999-00709-COA-R3-CV, 2000 Tenn. App. LEXIS 262, at *11 (Tenn. Ct. App. Apr. 24, 2000). Cases addressing the retaliatory discharge cause of action in a workers' compensation context do not specifically set forth the quantum of proof necessary for such a case to proceed to the jury for determination. *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 292 (Tenn. Ct. App. 1992). Thus, a plaintiff may prove causation "by presenting direct evidence of the necessary causal link or by introducing compelling circumstantial evidence of such a link." *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999) (citing *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992)). We are cognizant of the fact that, "[w]here, as here, the claim is one alleging retaliatory discharge and the essential factor to be determined is the employer's motivation, direct evidence of that motivation is rarely within the plaintiff's possession." *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534 (Tenn. 2002). "If an employee elects to shoulder this burden with circumstantial evidence, the employee must present direct and compelling circumstantial evidence." *Caldwell v. Nissan Motor Mfg. Corp., U.S.A.*, 968 S.W.2d 863, 865 (Tenn. Ct. App. 1997) (citing *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992)).

In an effort to prove causation, a plaintiff can present circumstantial evidence in numerous forms, to include the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false. *Flint Constr. Co. v. Hall*, 904 So.2d 236, 248 (Ala. 2004) (quoting *Ala. Power Co. v. Aldridge*, 854 So.2d 554, 564–65 (Ala. 2002)). A plaintiff's subjective beliefs, mere speculation, or testimony that the employee can think of no other reason for the discharge cannot, in and of themselves, create the requisite causal relationship. *Reed*, 4 S.W.3d at 685 (citing *Vaughan v. Harvard Indus., Inc.*, 926 F. Supp. 1340, 1350 (W.D. Tenn. 1996)); *see also Fuller v. Astec Indus., Inc.*, No. E2000-00721-COA-R3-CV,

2000 Tenn. App. LEXIS 610, at *5–6 (Tenn. Ct. App. Sept. 8, 2000); *McCain v. Airport Honda*, No. 03A01-9603-CV-00099, 1996 Tenn. App. LEXIS 618, at *3 (Tenn. Ct. App. Oct. 2, 1996). Moreover, an employee cannot rely on the mere short passage of time between the filing of a workers' compensation claim and subsequent termination to prove a prima facie case of retaliation. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 648 (Tenn. 1995).

Newcomb maintains that the record contains sufficient circumstantial evidence to warrant the trial court's decision to deny Kohler's motion for a directed verdict. We agree. While we need not reiterate all of the testimony offered at trial for purposes of resolving this issue, we will point out the crucial testimony.

At trial, Newcomb testified that after he returned to work following his injuries, George Rogers, his supervisor at the time, harassed him about his injuries and his decision to sue the company for workers' compensation benefits. Newcomb presented the testimony of other witnesses to corroborate this harassment. Roger Gordon worked at Kohler from 1968 until 2001, and he was Newcomb's supervisor for approximately twenty-five years. He stated that he and Don Whitehead, the manufacturing manager at the time, had meetings after Newcomb returned to work following his injuries. At these meetings, Mr. Whitehead told him to keep an eye on Newcomb because he sued the company and to look for a reason to get rid of him. Mr. Gordon also stated that Ken Ussery, the plant manger at the time, would also ask him to keep an eye on Newcomb after he returned to work. On cross-examination, Mr. Gordon admitted that he never heard Mr. Ussery or Mr. Whitehead state that they intended to fire Newcomb for filing a workers' compensation claim. He also admitted that he had no personal knowledge of why Newcomb was fired and that he never spoke to Mr. Thompson, Mr. Moore, or Mr. Stanford about Newcomb's termination.

Barry Burton had been at Kohler's Union City facility for seven years at the time of trial. He testified that he had a discussion with Mr. Moore after Newcomb's termination, during which they discussed Newcomb's termination. According to Mr. Burton, Mr. Moore stated that Newcomb was fired for cursing a fellow employee and "other things." Mr. Moore did not elaborate on what these "other things" consisted of during their conversation. Thelma Spears worked at the Kohler plant from 1970 until approximately 1995 or 1996. She testified that George Rogers commented that people like Newcomb were the reason the company's insurance premiums went up and why the employees were unable to get a raise. She admitted on cross-examination that she had no personal knowledge of what transpired at the facility after she left.

Pam Petty had worked at the facility for the past thirty-one years at the time of trial. She stated that Roger Gordon and George Rogers, both members of management, made comments about the fact that Newcomb had been injured on the job and sued the company. Linda Madrey began working at the plant in 1977 and retired in April 2004. She testified that George Rogers would harass Newcomb after he returned to work following an injury. When she suffered an injury herself, she testified that Mr. Rogers told her to sue the company like Newcomb had done and that she never got a raise because people like Newcomb sued the company.

Kohler presented the testimony of numerous members of management at the facility, both past and present. George Rogers took Roger Gordon's position when he left the facility in 2001. He denied ever telling Pam Petty or Thelma Spears that employees would not get raises because they sued the company. He also denied ever treating Newcomb different after he returned to work or that anyone ever suggested to watch Newcomb to find a way to fire him for filing a workers' compensation claim. Mr. Rogers admitted that he had knowledge of Newcomb's work injuries, but he stated that he had nothing to do with the decision to terminate his employment.

Tim Crowell had been at the plant for the past twenty-five years, and he is the supervisor who issued the written warning to Newcomb. He testified that he was not aware of Newcomb's prior workers' compensation claims and that no one ever told him to watch Newcomb and find a way to fire him. He also stated that he never discussed Newcomb's termination with Mr. Moore, Mr. Stanford, or Mr. Thompson. Jerry Ray, the prior human resources manager, testified that, while he had knowledge of Newcomb's workers' compensation claims, he never heard anyone suggest that he watch Newcomb to find a way to fire him for filing the claims. Further, he stated that he did not discuss Newcomb's termination with anyone at the facility. Tommy Stanford, however, admitted that it was common knowledge at the plant that Newcomb had been injured at work and sued the company. He also stated that he did not know of Newcomb's workers' compensation claims and that he was never told to watch Newcomb to find a way to fire him.

Kenneth Ussery served as the plant manager until 2000 when Mr. Goad took over. He never heard anyone suggest, nor did he suggest, that management watch Newcomb to find a way to terminate his employment for filing workers' compensation claims against the company. Buddy Thompson testified that he had no knowledge of Newcomb's prior workers' compensation claims when he suspended him for cursing Mr. Bridges and that he never heard anyone suggest watching Newcomb to find a way to fire him.

In its reply brief, Kohler argues that, since Ken Ussery, Don Whitehead, Roger Gordon, and Jerry Ray were no longer at the plant when Mr. Moore terminated Newcomb, any testimony relating to what they said or heard is not probative of Mr. Moore's motivation for terminating Newcomb. Kohler further argues that George Rogers' statements cannot be used to prove Mr. Moore's motivations because Mr. Rogers never spoke to Mr. Moore about Newcomb's termination. Finally, Kohler maintains that Mr. Burton's conversation with Mr. Moore after the firing is not probative because Mr. Moore never elaborated on the "other things" that warranted Newcomb's termination.

While Kohler argues that the aforementioned testimony offered by Newcomb is too attenuated to establish the necessary causal nexus, there is sufficient circumstantial evidence in the record to enable the jury to find that Newcomb's workers' compensation claims were or were not a substantial factor in Mr. Moore's motivation to terminate his employment.

Mr. Moore testified that the decision to terminate Newcomb was his alone and that he had no prior knowledge of Newcomb's workers' compensation claims when he terminated his employment. George Rogers, who is a present member of management and testified for Kohler,

offered a different understanding of Kohler's policy regarding terminations. He stated that only the plant manager could fire an employee and that several individuals in management are involved in a termination decision. Despite his assertion to the contrary, Mr. Moore himself stated that he informed the plant manager of his decision, and the plant manager affirmed Newcomb's termination. Thus, Kohler's assertion that it is uncontradicted that Mr. Moore alone decided to terminate Newcomb is not supported by the record in this case.

Next, while the management testified that they never discussed Newcomb's termination or workers' compensation claims with Mr. Moore, the record would enable a reasonable jury to conclude that Mr. Moore had knowledge of those claims. Mr. Stanford, Kohler's own witness, testified without objection that it was common knowledge at the plant that Newcomb suffered injuries at work and sued the company for workers' compensation benefits. Mr. Moore himself testified that he could access the employees' records, which included their medical and workers' compensation files. Although he denied looking at anything other than Newcomb's personnel file, it is for the jury to reconcile conflicting testimony and assess the witnesses' credibility. *Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 427 (Tenn. Ct. App. 1992).

Finally, Kohler maintains that, even if Mr. Moore knew of Newcomb's prior workers' compensation claims, there is no evidence tending to prove that Mr. Moore used Newcomb's prior workers' compensation claims as a pretext to terminate his employment. In support of this argument, Kohler points to the investigation conducted by Mr. Moore and the company's emphasis on its respectful workplace policy beginning with Mr. Goad's tenure as plant manager.

While Kohler presented the testimony of its management personnel to establish the basis for and implementation of the policy, Newcomb's counsel was able to establish on cross-examination that the managers have differing opinions about the basis for the policy and its implementation. Mr. Goad, the plant manager who implemented the policy, admitted that not every aspect of the policy was set forth in the Associate Handbook. Mr. Goad stated that the following language from the Associate Handbook, found under the heading Plant Rules of Conduct, set forth the respectful workplace policy: "Insubordination or use of profane or abusive language toward fellow associates or officials of the company or persons doing business with the company."

George Rogers testified that he understood that the first violation of the policy would warrant suspension, and the second offense would warrant termination. He felt, however, that a supervisor could terminate an employee on the first offense depending on the severity of the conduct. Tommy Stanford initially reiterated this practice in his direct testimony and testified that the language in the Associate Handbook governed discipline for violations of the respectful workplace policy. On cross-examination, however, he admitted that the Associate Handbook was not amended to expressly set forth the respectful workplace policy and that there were no written guidelines on how to enforce the policy.

Tim Crowell testified that, after Mr. Goad introduced the policy, Mr. Goad expressed zero tolerance for such behavior, and a company practice began by which employees could be terminated

for violating the policy. He also admitted, however, that he did not follow the five-step process in the Associate Handbook when he issued a written warning to Newcomb. Buddy Thompson also testified that the respectful workplace policy allowed a supervisor to terminate an employee upon the first violation of the policy. On cross-examination, Mr. Thompson agreed that cursing is not listed as a serious offense in the Associate Handbook, and he would not equate cursing to one of the serious offenses listed as examples.

Mr. Moore stated that the first violation of the policy would result in a three-day suspension and the issuance of a written warning followed by termination on a second offense. He could not recall, however, how he came to learn of the company's practices in enforcing the respectful workplace policy. When directed to the five-step process in the Associate Handbook, he described it as a "performance process" dealing with productivity, quality, and attendance issues as opposed to conduct issues. When asked to identify the respectful workplace policy in the Associate Handbook, Mr. Moore pointed to the following statement under the heading Company Ideals and Policies: "Mutual trust and respect are promoted between all elements of the Company and all associates at all times. Kohler is committed to providing a respectful workplace." Mr. Moore admitted that, prior to terminating Newcomb's employment, he had never terminated another employee for violating the respectful workplace policy. (T.E. Vol. 3, p. 312).

Based on our review of the evidence in the record, Newcomb presented circumstantial evidence tending to show that Kohler's management had a negative attitude toward his work-related injuries, had knowledge of his prior workers' compensation claims, and failed to adhere to the established policies set forth in the Associate Handbook. *See Flint Constr. Co. v. Hall*, 904 So.2d 236, 248 (Ala. 2004). Thus, a reasonable jury could conclude that Kohler used Newcomb's workers' compensation claims as a pretext to terminate his employment. Accordingly, we hold that the trial court did not commit error when it denied Kohler's motion for a directed verdict.

*D.*
*Jury Instructions*

On April 11, 2005, the day before the trial got underway, Kohler submitted fifteen proposed jury instructions for the trial court's review. The trial court rejected Kohler's proposed jury instructions, instead choosing to charge the jury with instructions selected by the court. Kohler questions the propriety of the trial court's decision to reject certain jury instructions proposed by Kohler.

"The trial court is the jury's sole source for the legal principles to guide their deliberations." *Grissom v. Metro. Gov't of Nashville*, 817 S.W.2d 679, 685 (Tenn. Ct. App. 1991) (citing *State ex rel. Myers v. Brown*, 351 S.W.2d 385, 388 (Tenn. 1961)). "The trial court's instructions must accurately embody the parties' respective theories and must be couched in plain terms that average jurors will understand." *Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 430 (Tenn. Ct. App. 1992) (citations omitted). "Trial courts should give a requested instruction if it satisfies three requirements: (1) it is supported by the evidence, (2) it embodies the party's theory, (3) it is a correct statement of

the law." *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 445 (Tenn. 1992) (citations omitted). "However, they need not give a special instruction whose substance is already covered in the general charge." *Id.* (citations omitted); *see also Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897, 908 (Tenn. Ct. App. 2001).

Kohler bears the burden of demonstrating that an error exists in the instructions provided to the jury that likely resulted in prejudice to its position at trial, *Owens v. Univ. Club of Memphis*, No. 02A01-9705-CV-00103, 1998 Tenn. App. LEXIS 688, at *47 (Tenn. Ct. App. Oct. 15, 1998), as "[w]e will not reverse a trial court unless the failure to give a requested charge 'more probably than not' affected the judgment," *Miller*, 73 S.W.3d at 908 (quoting TENN. R. APP. P. 36(b)). When evaluating jury instructions on appeal, we do not attempt to measure the instructions against a standard of perfection. *Grissom*, 817 S.W.2d at 685. "The charge will not be invalidated as long as it fairly defines the legal issues involved in the case and does not mislead the jury." *Otis*, 850 S.W.2d at 446; *see also Sasser*, 839 S.W.2d at 430.

In this case, the trial court charged the jury with numerous instructions, including the jury's general duty, the proper method for evaluating direct and circumstantial evidence, the proper method for evaluating the credibility of witnesses, and the burden of proof. Regarding Newcomb's overriding claim for retaliatory discharge, the trial court's instruction provided:

> In this case, there is no employment contract stating a term of employment. The Kohler Associate Handbook is not a contract.
>
> Generally an employer can discharge an employee-at-will, such as plaintiff, for good cause, for bad cause, or for no cause at all, without incurring liability for damages. However, there is an exception to this rule where the employer has violated the established public policy of our state. Such a violation of public policy occurs when the employee is discharged in retaliation for the employee's exercise of a right or duty established by statute or recognized by public policy.
>
> It is the policy and the law of this state that employees must be able to exercise their rights under the workers' compensation laws without fear of reprisal or penalty from an employer.
>
> Therefore, if you find that plaintiff's exercise of a right established by statute or recognized by public policy was a substantial motivating factor in the defendant's decision to discharge the plaintiff and the discharge was in retaliation for the plaintiff's exercise of rights, then you may award damages.
>
> To prevail in a retaliatory discharge case alleging a violation of the workers' compensation law, an employee must prove:
> 1. That the plaintiff was employed by the defendant;
> 2. That the plaintiff sought workers' compensation benefits[;]

3. That the defendant discharged the plaintiff; and

4. That the request for workers' compensation benefits was a substantial motivating factor in the defendant's discharge decision.

"Substantial factor" means an important or significant factor, but not the sole or exclusive factor.

Subjective beliefs, conjecture, or speculation are insufficient to create the necessary causal link between a claim for workers' compensation benefits and an employee's subsequent discharge.

If you find that the plaintiff's exercise of rights under the workers' compensation act was a substantial motivating factor in the defendant's decision to discharge the plaintiff, then you must find that this was a retaliatory discharge, even though other reasons may have existed for discharge.

This instruction, as do the other instructions chosen by the trial court, tracks the language of the Tennessee Pattern Jury Instructions. 8 TENN. PRACTICE: TENN. PATTERN JURY INSTRUCTIONS — CIVIL § 8.60 (5th ed. 2004).

Kohler argues that the trial court erred by refusing to give its first proposed jury instruction to the jury, which provided, in relevant part, as follows: "You must first determine whether the Plaintiff has proven by a preponderance of the evidence that Chris Moore knew that the Plaintiff had filed claims for workers' compensation benefits at the time he made the decision to terminate the Plaintiff's employment." On appeal, Kohler maintains that the trial court erred when it failed to give this instruction because "the jury was allowed to erroneously conclude there was no legal requirement that it must first find the decision maker knew of Plaintiff's workers' compensation claims before he could act, in whole or in part, based on the claims."

We have concluded that the substance of Kohler's instruction was covered in the trial court's general charge. The court's instruction to the jury stated that an employee must prove "that the request for workers' compensation benefits was a substantial motivating factor in the defendant's discharge decision." In finding that the Plaintiff's workers' compensation claims substantially motivated his employer's decision to terminate him, the jury was implicitly required to determine that the decision maker had knowledge of the claims. Kohler's proposed instruction would have merely added a preliminary step to the jury's analysis. "Where the court correctly charges the law applicable to the case, it is not error to deny a special request that embodies a theory of a party if the court charges in general terms and with clearness sound propositions of law which would guide the jury in reaching a correct decision in the case." *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 445 (Tenn. 1992) (citing *St. Louis I.M. & S. Ry. Co. v. Hatch*, 116 Tenn. 580, 593, 94 S.W. 671, 674 (1906)). Kohler asserts that the trial court's instruction allowed the jury to conclude that the claims substantially motivated the decision of the Defendants without a finding that the Defendants knew of the workers' compensation claims. We find this argument to be nonsensical, and we certainly cannot say that the trial court's rejection of the proposed instruction "more probably than

not" affected the judgment. Accordingly, we affirm the trial court's decision to reject this proposed instruction.

Kohler argues that the trial court erred in rejecting its third proposed jury instruction, which provided: "The Plaintiff, Barney Newcomb, must present proof other than merely the facts showing his employment, his exercise of rights under the Workers' Compensation Law, and his subsequent discharge." On appeal, Kohler argues that, in the absence of this instruction, "the jury was allowed to erroneously conclude that proof of employment, a claim for workers' compensation benefits, and subsequent discharge was sufficient to allow the Plaintiff to recover this case." Kohler also argues that the trial court erred in rejecting its tenth proposed jury instruction, which provided:

> The Plaintiff must prove by a preponderance of the evidence that his claim for workers' compensation benefits, as opposed to his injury, was the true reason for his termination by Chris Moore. It is no [sic] enough for the Plaintiff to show only that he suffered an on-the-job injury and was later discharged.

Kohler maintains that the trial court's rejection of this instruction allowed the jury "to conclude that if it thought the injuries caused the discharge, that was sufficient to allow the Plaintiff to recover damages."

The aforementioned general charge given by the trial court sufficiently set forth the four elements necessary to proving a claim for retaliatory discharge, which included the requirement that the plaintiff prove that his workers' compensation claims were a substantial motivating factor in the employer's discharge decision. Accordingly, Kohler's arguments regarding its third and tenth proposed jury instructions are without merit.

Kohler argues that the trial court erred in rejecting its fourth proposed jury instruction, which provided: "The Plaintiff may prove the necessary causal link between his claim for workers' compensation benefits on (date or dates) and his subsequent termination on April 4, 2003, by presenting direct evidence of this necessary causal link or by introducing compelling circumstantial evidence of such a link." On appeal, Kohler argues that by failing to give this instruction, "the jury was allowed to erroneously conclude that the Plaintiff could recover if he had only circumstantial evidence, rather than needing compelling circumstantial evidence." Kohler also argues that the trial court erred in rejecting its fourteenth proposed jury instruction, which provided: "The burden of proof is on the Plaintiff, Barney Newcomb, to prove all the elements of his claim that he was terminated on April 4, 2003, for making a claim for workers['] compensation benefits on (date or dates) by compelling circumstantial evidence since there is no direct evidence in this case." Kohler maintains that the rejection of this instruction allowed the jury "to erroneously conclude that only circumstantial evidence was needed, rather than compelling circumstantial evidence."

It is true that the trial court's general instructions do not state that Newcomb was required to prove his claim by presenting compelling circumstantial evidence. *See Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992) (noting that a plaintiff may prove the requisite causal connection by presenting "compelling circumstantial evidence"). When reviewing the jury instructions as a whole and the entire record, however, it is clear that there is sufficient compelling circumstantial evidence to enable a jury to find in favor of Newcomb. Thus, even if this omission constituted an error in the trial court's charge to the jury, we hold that it does not rise to a level that would warrant the reversal of the jury's verdict. *Owens v. Univ. Club of Memphis*, No. 02A01-9705-CV-00103, 1998 Tenn. App. LEXIS 688, at *47–48 (Tenn. Ct. App. Oct. 15, 1998).

Kohler argues that the trial court erred in rejecting its seventh proposed jury instruction, which provided:

> While you may or may not agree with the conclusions reached by Chris Moore during his investigation concerning whether or not Barney Newcomb in fact said F — Y — to James Bridges, it is not the jury's role to decide whether he made the correct decision based on the facts presented to him. That is to say, the jury is not to act as a "super-personnel manager" and review the decision of Moore as the decisionmaker. It is not the role of the jury to "second guess" or "Monday morning quarterback" employment decisions.
> You are only to decide whether the Plaintiff has proven by a preponderance of the evidence that the decision to terminate the Plaintiff was because he made claims for workers' compensation benfeits on (date or dates).

On appeal, Kohler argues that by rejecting this instruction, the trial court "erroneously allowed the jury to act as a 'super-personnel manager' and review the decision [of] Chris Moore on the merits as to whether the Plaintiff, in their opinion, did or did not say 'F*** you, Bridges." Further, Kohler asserts that by rejecting this instruction, the trial court "allowed the jury to consider the 1984 injury and claim for benefits which was at a time when the Plaintiff was employed by United States Gypsum, not the Defendant."

Kohler offers no citation to authority in its brief to establish that its seventh proposed jury instruction is required by law to be given. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 445 (Tenn. 1992). Moreover, the authority cited by Kohler in its proposed jury instruction does not stand for the proposition that this instruction is required in cases of this nature. *See Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988); *Miller v. City of Murfreesboro*, 122 S.W.3d 766 (Tenn. Ct. App. 2003); *Spann v. Abraham*, 36 S.W.3d 452 (Tenn. Ct. App. 1999); *DeVore v. Deloitte & Touche*, No. 01A01-9602-CH-00073, 1998 Tenn. App. LEXIS 122 (Tenn. Ct. App. Feb. 20, 1998). Further, we find no error in the trial court's decision to forego setting forth the specific dates of Newcomb's injuries for the jury's consideration. While the 1984 injury occurred while the facility

was under the control of United States Gypsum, the employees and management retained their positions and the employees' files remained at the facility after Kohler took control. Thus, management's treatment of Newcomb when he returned to work after his first injury and Mr. Moore's access to his employment records, which apparently included his first on-the-job injury, were proper aspects of Newcomb's circumstantial proof in this case. Accordingly, we cannot say that the trial court erred in rejecting this instruction.

Kohler argues that the trial court erred in rejecting its ninth proposed jury instruction, which provided:

> You are not to consider whether the discipline which was imposed upon the Plaintiff was reasonable or rational. The Defendant can discipline the Plaintiff for any reason or no reason at all as long as the reason for discipline was not because the Plaintiff made a claim for workers' compensation benefits.

On appeal, Kohler argues that by rejecting this instruction, the trial court allowed the jury "to conclude it could make its on [sic] judgment as to the fairness of the decision, as opposed to whether Chris Moore decided to terminate the Plaintiff for making a claim for workers' compensation benefits." Kohler offers no citation to authority in its brief to establish that a trial court in cases of this nature is required to give this jury instruction. Moreover, the authority cited in its proposed jury instruction does not support the conclusion that such instruction is required in this case. *See Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559–61 (7th Cir. 1987). Accordingly, this argument is without merit.

Kohler argues that the trial court erred in rejecting its eleventh proposed jury instruction, which provided:

> If you find that the Plaintiff has proven by a preponderance of the evidence that he was terminated on April 4, 2003, by Chris Moore because he made a claim for workers' compensation benefits on (date or dates), then you may consider awarding the Plaintiff compensatory damages for back pay, but such amount may not exceed the amount prayed for in the Plaintiff's Amended Complaint.

Kohler argues that the trial court's rejection of this instruction permitted the jury "to award more than the amount requested in the original Amended Compliant in effect at the commencement of this trial on April 12, 2005." As discussed *supra*, we have determined that the trial court did not err in allowing Newcomb to amend his complaint during the trial to request a specific amount in damages. As the jury's award of back pay equaled the amount sought by Newcomb after amending his complaint, Kohler is not prejudiced by the trial court's failure to charge the jury with this instruction. Accordingly, we find no error in this regard.

Finally, Kohler states that the jury sent a note to the trial court, presumably during its deliberations, inquiring as to why Don Whitehead did not testify in the case. Kohler alleges that it asked the trial court to charge the jury regarding the Missing Witness Rule, but the trial court refused to do so. The record in this case does not contain a copy of any note from the jury or any discussion about instructing the jury on the Missing Witness Rule as to this witness. Kohler argues, in a three sentence paragraph contained in its brief, that the trial court's refusal to give the instruction allowed the jury to assume that, because Kohler did not call Mr. Whitehead as a witness, it attempted to hide something from the jury. Kohler offers no citation to the record or to any authority in support of this argument.

"Under the missing witness rule, a party is entitled to argue, and have the jury instructed, that if the other party has it peculiarly within his power to produce a witness whose testimony would naturally be favorable to him, the failure to call that witness creates an adverse inference that the testimony would not favor his contentions." *State v. Middlebrooks*, 840 S.W.2d 317, 334 (Tenn. 1992) (citing *State v. Francis*, 669 S.W.2d 85, 88 (Tenn. 1984); *State v. Jones*, 598 S.W.2d 209, 224 (Tenn. 1980)). The inference generated by the operation of the rule does not amount to substantive evidence of a fact from which no other evidence was offered to prove the fact. *McReynolds v. Cherokee Ins. Co.*, 815 S.W.2d 208, 210 (Tenn. Ct. App. 1991). "The extent of its effect is to impair the weight of the evidence of the party affected and to enhance the weight of his adversary." *Id.* (citing *Nat'l Life & Accident Ins. Co. v. Eddings*, 221 S.W.2d 695, 697–99 (Tenn. 1949)). The inference will not operate where the only object for calling the witness would have been to produce corroborative, cumulative, or unnecessary evidence. *Dickey v. McCord*, 63 S.W.3d 714, 721 (Tenn. Ct. App. 2001).

"The mere fact that a party fails to produce a particular person who may have some knowledge of the facts involved does not justify application of the inference against him." *State v. Francis*, 669 S.W.2d 85, 88 (Tenn. 1984). Before the missing witness rule can be invoked, the evidence must show that "[(1)] the witness had knowledge of material facts, [(2)] that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and [(3)] that the missing witness was available to the process of the Court for trial." *State v. Bigbee*, 885 S.W.2d 797, 804 (Tenn. 1994) (citations omitted). Due to the potential effects of invoking the rule, courts must construe these requirements strictly, *Francis*, 669 S.W.2d at 89, and exercise restraint in those instances when the rule is applicable, *McReynolds*, 815 S.W.2d at 209.

Other than a terse paragraph in its brief, Kohler offers no citation to authority or argument to demonstrate that any of the prerequisites necessary to the operation of the rule are present in this case. This Court ordinarily must confine its review to the issues presented by the parties on appeal. TENN. R. APP. P. 13(b) (2005). In addressing such issues, we rely on the parties to provide us with a record setting forth the underlying basis for the issue, *see* TENN. R. APP. P. 13(c), 24 (g) (2005), as well as "[a]n *argument* . . . setting forth the contentions of the appellant with respect to the issues presented, and the *reasons* therefor, including the reasons why the contentions require appellate relief, with *citations to the authorities* and appropriate *references to the record* . . . relied on," TENN. R. APP. P. 27(a)(7) (2005) (emphasis added).

A skeletal argument that is really nothing more than an assertion will not properly preserve a claim, especially when the brief presents a multitude of other arguments. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam). It is not the function of the appellate court to research and construct the parties' arguments. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). The Appellant's Brief "should contain an argument setting forth the contentions of the appellant with respect to the issues presented with citations to the authorities and appropriate references to the record." *Rhea County v. Town of Graysville*, No. E2001-02313-COA-R3-CV, 2002 Tenn. App. LEXIS 539, at *20 (Tenn. Ct. App. July 25, 2002); *see also Berkowitz*, 927 F.2d at 1384. The failure of a party to cite to any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue. *See Rector v. Halliburton*, No. M1999-02802-COA-R3-CV, 2003 Tenn. App. LEXIS 149, at *25 (Tenn. Ct. App. Feb. 26, 2003) (per curiam); *Rhea County*, 2002 Tenn. App. LEXIS 539, at *19–20. Accordingly, this aspect of Kohler's appeal is without merit.

### E.
### Trial Court as Thirteenth Juror

In its motion for a new trial, Kohler asked the trial court, acting as thirteenth juror, to set aside the jury's verdict based upon an independent weighing of the evidence presented at trial. The trial court declined the invitation. Kohler argues that this constituted error since the record contains no evidence establishing a causal connection between Newcomb's workers' compensation claims and his termination.

"When acting as the thirteenth juror in considering a motion for a new trial, the trial court must independently weigh the evidence, determine the issues presented, and decide whether the jury's verdict is supported by the evidence." *Dickey v. McCord*, 63 S.W.3d 714, 718 (Tenn. Ct. App. 2001) (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 717 (Tenn. Ct. App. 1999)). If a trial court properly performs its duty as thirteenth juror, we are limited to a determination of whether there is any material evidence in the record to support the jury's verdict. *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996). "An appellate court presumes the trial court properly performed its duty as the thirteenth juror when the trial court approves the jury's verdict without comment." *Dickey*, 63 S.W.3d at 718.

Our analysis of the trial court's denial of Kohler's motion for a directed verdict *supra* is sufficient to establish that the record contains material evidence to support the jury's verdict in this case. Thus, we need not reiterate in exhaustive detail the evidence already discussed in that section of the opinion. *See Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 639 (Tenn. Ct. App. 1993). Accordingly, we hold that the trial court competently performed its role as thirteenth juror and that the record supports its decision to affirm the jury's verdict.

In retaliatory discharge cases of this nature, "the clearest way to make the plaintiff whole is to supplement the back pay award with reinstatement to the job." *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 331 (Tenn. 1996). Thus, we have held that reinstatement, where feasible, is the preferred remedy in cases of this nature. *Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 432 (Tenn. Ct. App. 1992). Reinstatement, however, is not the only method by which a wrongfully discharged employee can be made whole. "Where reinstatement is not feasible, the court may order front pay — a monetary award intended to compensate the plaintiff for the loss of future earnings." *Coffey*, 929 S.W.2d at 332. "Reinstatement is an equitable remedy, and front pay is an equitable substitute for reinstatement." *Sasser*, 839 S.W.2d at 435 (citations omitted). Thus, "[e]ven though front pay is an award for monetary relief, it is still an equitable remedy." *Id.* (citations omitted). As the choice between reinstatement or front pay involves a choice of remedies, we have held that the decision is properly left to the trial court and not the jury. *Id.*

After the trial in this matter, the trial court held a hearing to determine whether reinstatement was warranted in this case. At the hearing, Newcomb testified that he did not wish to return to work at Kohler because he had been accused of something he did not do (i.e. cursing a fellow employee), he felt that management would try to find a reason to fire him again, and he would have a problem getting along with management after the litigation. Kohler offered no proof in response to Newcomb's testimony nor did they cross-examine him. Kohler did, however, offer to reinstate Newcomb and make accommodations for his work-related injuries.

After taking the matter under advisement, the trial court subsequently entered an order stating:

> The Court finds that reinstatement is not practicable for three reasons: First, the upper management employees of the defendant through their testimony and demeanor demonstrated hostility toward the plaintiff. Second, the defendant informed the Court that it would accept the plaintiff as an employee and find a job for him, but did not specify what job would be available to him. There was no guarantee made by the defendant that the job would be one the plaintiff could perform. The third reason is that the Court has a serious concern that the plaintiff would be terminated again. The defendant contended that the plaintiff was terminated for violating the "respectful workplace policy". However, this policy is not in writing, is not defined, and may be subjectively and arbitrarily interpreted and applied by the person making the decision. The defendant is a non-union plant, and the plaintiff would not have the benefit of a union representative or a union contract nor would he be entitled to an

appeal of an adverse decision. If the defendant is terminated again, he would have no recourse.

Thus, the trial court decided that an award of front pay was warranted, holding:

> This case was tried almost exactly two years after the plaintiff was discharged. The undisputed testimony is that the plaintiff applied for work at a number of businesses, but no one hired or expressed any interest in him. He had no job prospects at the time of the trial.
>
> The plaintiff has had four prior workers' compensation awards. . . .
>
> The plaintiff is 49 years of age and has a ninth grade education. He went to work at the defendant's plant in 1975 and worked there until his discharge in 2003. His only other work experience was in a garment factor [sic] and on a ferry boat.
>
> The Court finds that the only work available to the plaintiff is a minimum wage job such as a Wal-Mart greeter.
>
> The Court also finds that the plaintiff has approximately 16 years before he may draw full social security benefits and is entitled to front pay for 16 years. In 2002, the plaintiff's last full year at Kohler, he earned $25,661.00. Had he remained at Kohler (assuming no wage increases) he would have earned $410,576.00. The Court also finds that the plaintiff has 15 years before he is eligible for Medicare, and is entitled to the cost of health insurance for 15 years. In his last full year at Kohler, the cost of the health insurance was $6,000.00 a year. The cost of the health insurance (assuming no increase in premiums) for 15 years is $90,000.00. Accordingly, the plaintiff is entitled to total benefits of $500,576.00, less what he may earn at a minimum wage job. The Court finds this amount to be $10,300.00 a year or a total of $164,800.00. Accordingly, the Court finds the plaintiff is entitled to front pay in the amount of $335,776.00.

On appeal, Kohler argues that front pay is not appropriate in this case because the trial court should have awarded reinstatement. Kohler maintains that Newcomb failed to show that reinstatement is not feasible, other than speculating that the employment relationship is irreparably harmed by this litigation. Regarding the reasons given by the trial court for rejecting reinstatement, Kohler asserts that the trial court erred in several respects. First, it failed to cite examples of the hostility displayed toward Newcomb. Second, despite Kohler's assurances that it would accommodate Newcomb's injuries if he were reinstated, the trial court erred in noting that Kohler failed to specify if it would offer a job that Newcomb would be able to perform. Finally, the trial

court erred because there is no evidence that Kohler would seek to terminate Newcomb's employment if he returned to work.

A trial court's decision between reinstatement and front pay can present mixed questions of fact and law. *Lowrimore v. Certified Indus., Inc.*, No. M1998-00938-COA-R3-CV, 2001 Tenn. App. LEXIS 507, at *5–6 (Tenn. Ct. App. July 19, 2001). To the extent we are presented with questions of law, we will review the trial court's decision de novo affording no presumption of correctness to the decision. *Id.* at *6. To the extent that Kohler makes a fact based argument on appeal, we will presume that the trial court's factual decision is correct unless the preponderance of the evidence is otherwise. *Id.*

"Employees are not required to accept unreasonable reinstatement offers." *Sasser*, 839 S.W.2d at 433. However, "when an employer has made a bona fide offer, the employee has the burden of demonstrating that reinstatement is not feasible." *Id.* There are several circumstances when reinstatement may not be feasible, including (1) "where the employer has demonstrated such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible," (2) "where no comparable job is available," (3) "when it disrupts the employment of others," (4) "when the employment relationship has been irreparably damaged by animosity associated with the litigation," (5) "when the plaintiff is relatively close to retirement," and (6) "when the plaintiff is a high management employee." *Id.* The hostility expressed by the employer toward the employee is perhaps the most common circumstance where reinstatement will not be feasible, *Coffey*, 929 S.W.2d at 331–32, but "[t]he discord between the parties must rise above the friction normally associated with litigation," *Sasser*, 839 S.W.2d at 433 n.9.

The record in this case contains sufficient proof to support the trial court's conclusion that Kohler has demonstrated hostility toward Newcomb and that he could potentially face future efforts by Kohler to terminate his employment if he were reinstated. Several witnesses who testified on behalf of Newcomb conveyed the harassment Newcomb received from management after he returned to work following his injuries. The trial court's conclusion that the respectful workplace policy was not as clear as Kohler attempted to demonstrate is likewise supported by the record. Kohler's own witnesses, who were members of management, offered conflicting accounts of the policy's meaning, its implementation, and its codification in the Associate Handbook. Accordingly, we affirm the trial court's decision to bypass reinstatement and proceed to enter an award of front pay.

In the event that we affirm the trial court's decision to forego reinstatement, Kohler stands ready with an alternative argument. Kohler maintains that the front pay awarded by the trial court is excessive. Kohler directs our attention to Newcomb's testimony at the reinstatement hearing, where he stated that his attempts to find suitable employment had proved futile. Newcomb expressed a desire to open his own car lot business. He opined that, if he opened his own business, it would take him three to five years to make what he was making at Kohler at the time of his termination. Thus, Kohler argues that the only evidence before the trial court was that Newcomb will be made whole in five years at the latest, not sixteen years as found by the trial court.

Front pay is "reserved for only the most egregious circumstances." *Sasser*, 839 S.W.2d at 433. "It is not intended to be punitive, or to provide an employee with a windfall." *Id.* (citations omitted). "It is, simply, an award of prospective damages for the loss of future earnings." *Id.* "Front pay awards do not lend themselves to precise calculation." *Id.* Due to the uncertainty surrounding an employee's future potential at the old job and the employee's potential earnings at a new job, we have described a calculation of front pay as "intelligent guesswork" by the trial court. *Id.* at 433–34. Although they may be uncertain, front pay awards are not so speculative that they can never be available in an appropriate case. *Id.* at 434. In order to keep any uncertainty surrounding such awards in check, a trial court is instructed to consider many factors:

> (1) the employee's future in his or her old job, (2) the employee's work and life expectancy, (3) the employee's obligation to mitigate his or her damages, (4) the availability of comparable employment opportunities and the time reasonably required to find another job, and (5) the amount of any award for liquidated or punitive damages.

*Id.* "The appropriate period for an award of front pay must turn on each case's specific facts." *Lowrimore*, 2001 Tenn. App. LEXIS 507, at *17.

Other than expressing an interest in opening his own business, there was no economic basis upon which the trial court could conclude that Newcomb would be made whole in five years as Kohler suggests. To the contrary, Newcomb testified that he was forty-nine years old and had only a ninth grade education. Due to his work-related injuries, Newcomb expressed concern about performing labor intensive jobs, including his old job at Kohler. When he applied for other jobs in related fields, he had to list his medical condition. Newcomb stated that he never received a job offer, presumably due to his medical condition. The trial court determined that Newcomb attempted to mitigate his damages, but he was unable to secure employment. Kohler offered no evidence to rebut this finding. Finally, given the evidence presented at trial concerning management's treatment of Newcomb following his work-related injuries, one could conclude that his future in his old job is less than certain.

"A trial court's front pay determination must have a rational basis in relation to the evidence." *Lowrimore*, 2001 Tenn. App. LEXIS 507, at *12. In *Lowrimore*, we stated that an award of front pay for a period of twenty years would not be inappropriate given sufficient facts to support such an award. *Id.* at *18. We hold that the record contains sufficient facts to warrant the front pay award handed down in this case.

## IV.
### CONCLUSION

For the foregoing reasons, we hold that the trial court did not commit error when it allowed the Appellee to amend his complaint during the trial; did not commit error when it admitted certain evidence over the Appellant's objection; did not commit error when it denied the Appellant's motion for a directed verdict; did not commit error when it rejected the Appellant's proposed jury instructions; did not commit error in affirming the jury's verdict while acting as thirteenth juror; and did not commit error when it determined that reinstatement was not warranted in this case, therefore, the Appellee was entitled to an award of front pay. Accordingly, we affirm the trial court's judgment on the jury verdict. Costs of this appeal are to be taxed to the Appellant, Kohler Company, and its surety, for which execution, if necessary, may issue.

_____
ALAN E. HIGHERS, JUDGE