# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 5, 2014

## IN RE CARRINGTON H., ET AL.

### Appeal from the Juvenile Court for Maury County
### No. 90576, 90577     George L. Lovell, Judge

---

### No. M2014-00453-COA-R3-PT - Filed October 21, 2014

---

This appeal arises from the termination of Mother's parental rights. After a five-year cycle of removal and failed reunification attempts, the juvenile court awarded temporary custody of the child to the State in 2009, and shortly thereafter, ordered that Mother have no visitation or contact with her child. The court later ratified a permanency plan, but nearly two years later, the Tennessee Department of Children's Services petitioned to terminate Mother's parental rights. Following a trial, the juvenile court entered an order terminating Mother's parental rights on the grounds of: (1) substantial noncompliance with the permanency plan; (2) persistence of the conditions that led to the child's removal; and (3) incompetency to adequately provide for the further care and supervision of the child. Mother appeals two of the three grounds for termination and the court's determination that termination was in the best interest of the child. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Mark A. Free, Columbia, Tennessee, for the appellant, Vanessa G.

Robert E. Cooper, Jr., Attorney General and Reporter, and Mary Byrd Ferrara, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the termination of the parental rights of Vanessa G. ("Mother") to her child, Carrington H.[1] By the time this matter came on for trial, Carrington's family had been receiving services from the Tennessee Department of Children's Services ("DCS") for over ten years. Shortly before Carrington's birth in 2004, the juvenile court found his five siblings to be dependent and neglected. Despite a finding that, at the time of removal, the home "was in such a condition as to make it unsafe and unsanitary for the children to reside there," the children were allowed to remain in the home with Mother and their father, Christopher H. ("Father").

Soon after his birth, DCS placed Carrington and his siblings in protective custody. On January 6, 2006, the juvenile court found probable cause to determine that the children were dependent and neglected. The juvenile court granted physical custody to the children's maternal aunt and maternal grandmother. Mother was granted supervised visitation with the four oldest children every weekend and with Carrington and another sibling every other weekend. The court later returned the children to Father's custody and suspended Mother's visitation for a period of time.

On July 13, 2007, DCS filed a petition to adjudicate dependency and neglect based on allegations of sexual abuse perpetrated by Mother. The juvenile court suspended all visitation between Mother and children on August 8, 2007. Mother waived the adjudicatory hearing, and the court ordered that the children would remain in the custody of Father, who by this time was divorced from Mother.

At some later date, not specified in the record, Mother regained her visitation privileges. However, following a review that took place in November 2009, the juvenile court ordered that Mother have no contact or visitation with her children until such time as they "on their own volition, request such visitation."

Carrington and the other children were removed from Father's custody on December 18, 2009, following allegations of child abuse by Father. Three days later, DCS filed yet another petition to adjudicate the children dependent and neglected. On September 8, 2011, Father pleaded guilty to child abuse. Ultimately, the children were found to be dependent

---

[1] The petition for termination of Mother's parental rights originally concerned both Carrington H. and a sibling, Charles H. However, Charles H. has reached the age of majority and is no longer a subject of this proceeding.

and neglected and ordered to remain in DCS custody. The court ratified the last permanency plan for Carrington's family on December 1, 2011.

On October 24, 2013, DCS filed a petition to terminate Mother's and Father's parental rights.[2] The Maury County Juvenile Court conducted a one-day trial on December 20, 2013. In support of its petition, DCS presented four witnesses: (1) a counselor service worker for the Department of Human Services; (2) Ms. Elysse Beasley, Mother's psychotherapist; (3) Mother's therapist at Centerstone; and (4) Mr. Richard Walker, Carrington's clinical social worker. Mother did not put on any proof.

On February 27, 2014, the juvenile court entered an order terminating Mother's parental rights to Carrington. As grounds for termination, the juvenile court found that Mother: (1) failed to substantially comply with the reasonable requirements in the permanency plan; (2) failed to remedy the conditions that led to the child's removal or other conditions that, in all reasonable probability, would subject the child to further abuse and neglect; and (3) was incompetent to adequately provide for the further care and supervision of the child because of her impaired mental condition. The juvenile court also found termination of Mother's parental rights to be in the child's best interest.

Mother raises two issues on appeal. First, Mother argues that the trial court erred in finding that she failed to substantially comply with the permanency plan and that the conditions that led to the child's removal persist. Second, Mother argues that the trial court erred when it determined that termination of Mother's parental rights was in the child's best interest.

## II. ANALYSIS

### A. Standard of Review

Termination of parental rights is one of the most serious decisions courts make. As noted by the United States Supreme Court, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1) (Supp. 2013).

---

[2] Based upon his stated intention to surrender his parental rights to Carrington upon the final termination of Mother's rights, DCS voluntarily dismissed the petition against Father.

A parent has a fundamental right, based in both the federal and State constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The State may interfere with parental rights through judicial action in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence that at least one of the statutory grounds for termination exists and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *see Santosky*, 455 U.S. at 769, and its purpose "is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see also In re Angela E.*, 303 S.W.3d at 250; *In re M.W.A.*, 980 S.W.2d at 622. "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). The party seeking termination has the burden of proof. *Id.*

Appellate courts first review the trial court's findings of fact in termination proceedings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Next, "[i]n light of the heightened burden of proof in [termination] proceedings . . . the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all

the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. Appellate courts review the trial court's conclusions of law de novo without any presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007) (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993)).

### B.    Statutory Grounds for Terminating Mother's Parental Rights

The juvenile court relied on three statutory grounds for terminating Mother's parental rights to Carrington: (1) substantial noncompliance with the permanency plan; (2) persistent conditions; and (3) incompetency to adequately care for the child. Mother appeals the trial court's decision on only two of the three statutory grounds, leaving the court's finding of incompetency unchallenged.

DCS argues that, because Mother did not appeal the incompetency ground, the trial court's finding on that ground is final, and we need not examine the other two grounds. In support of this proposition, DCS cites *In re Alexis L.*, No. M2013-01814-COA-R3-PT, 2014 WL 1778261 (Tenn. Ct. App. Apr. 30, 2014). In that case, the trial court found five statutory grounds to terminate the mother's parental rights, but she appealed only four of the grounds. *Id.* at *2. We concluded that the mother's failure to appeal a ground for termination waived that issue, and as a result, the trial court's finding regarding that ground was final. *Id.* Because only one statutory ground need be found for termination, we declined to examine the other grounds and moved directly to an analysis of whether termination was in the child's best interests. *Id.* at *1.

Generally, courts address only the issues raised by the parties. *Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012); Tenn. R. App. P. 13(b). Party control over issue presentation is considered a defining characteristic of the American adversarial system. *See U.S. v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., dissenting). However, courts may sometimes engage in a sua sponte review of issues not raised by the parties on appeal. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *Blumberg Assocs. Worldwide, Inc. v. Brown & Brown of Conn.*, 84 A.3d 840, 855-69 (Conn. 2014); *Bell v. Todd*, 206 S.W.3d 86, 90-91 (Tenn. Ct. App. 2005); *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000). For example, our courts have considered justiciability issues even when parties have not presented such issues for review. *See, e.g.*, *Scales v. Winston*, 760 S.W.2d 952, 953 (Tenn. Ct. App. 1988) (jurisdiction); *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004) (standing); *Hooker v. Haslam*, 437 S.W.3d 409, 433 (Tenn. 2014) (mootness). In addition to justiciability questions, Tennessee Rule of Appellate Procedure 13(b) recognizes that appellate courts may review issues not raised by the parties in certain circumstances:

Review generally will extend only to those issues presented for review. The appellate court shall also consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review, and may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation; (2) to prevent injury to the interests of the public; and (3) to prevent prejudice to the judicial process.

Tenn. R. App. P. 13(b). Despite possessing the discretion to review an issue not raised by the parties on appeal, "this discretion [should] be sparingly exercised." Tenn. R. App. P. 13(b) cmt.

Yet, in the context of parental termination cases, on occasion we have reviewed all the grounds relied upon by the trial court to terminate parental rights, even if the parent did not appeal every ground. *See, e.g.*, *In re Anya G.*, No. E2013-02595-COA-R3-PT, 2014 WL 4233244 (Tenn. Ct. App. Aug. 27, 2014) (reviewing the ground of abandonment, although the mother did not appeal that ground); *In re Justin K*, No. M2012-01779-COA-R3-PT, 2013 WL 1282009 (Tenn. Ct. App. Mar. 27, 2013) (examining whether termination was in the children's best interests due to the "gravity of the determination," even though the parent did not brief the issue); *In re L.M.W.*, 275 S.W.3d 843 (Tenn. Ct. App. 2008) (discussing two grounds for termination despite Father's concession in his brief that the grounds were established); *cf. In re L.L.F.*, No. M2007-01656-COA-R3-PT, 2008 WL 555700 (Tenn. Ct. App. Feb. 29, 2008) (reviewing the statutory ground the mother appealed, but acknowledging that the mother did not appeal all grounds for termination). We are also mindful of our Supreme Court's instruction that we should review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010).

However, our supreme court's direction in *In re Angela E.*, 303 S.W.3d 240 (Tenn. 2010), does not mandate review of every ground for termination of parental rights relied upon by the trial court irrespective of whether an appeal is taken from every ground. *See, e.g.*, *In re Kyla P.*, No. M2013-02205-COA-R3-PT, 2014 WL 4217412, at *3 (Tenn. Ct. App. Aug. 26, 2014) (addressing only whether termination was in the child's best interests where the father did not appeal any statutory grounds); *In re A.T.S.*, No. M2004-01904-COA-R3-PT, 2005 WL 229905, at *3 (Tenn. Ct. App. Jan. 28, 2005) (examining only whether termination was in the child's best interests where the mother did not appeal the statutory ground). The danger of "unnecessary remand" from the Supreme Court is largely eliminated[3] where the issue cannot be raised by the parties in any future appeal. *See State v. West*, 19

_____

[3] The danger of unnecessary remand cannot be completely eliminated because the Supreme Court possesses the same discretion to consider issues not raised on appeal. Tenn. R. App. P. 1, 13(b).

S.W.3d 753, 756-57 (Tenn. 2000) (declining to examine a claim because it was not raised on direct appeal). In this situation, the trial court's determination that one statutory ground for termination is satisfied is final. Therefore, review of the alternative grounds becomes unnecessary because the outcome of such a review would not change the presence of at least one ground for terminating parental rights. Declining to undertake such a review honors the principle that courts review only those issues raised by parties and is in keeping with the requirements of Rule 13(b).

Here, the trial court's finding of Mother's incompetency is final because Mother failed to raise this issue on appeal. *Forbess v. Forbess*, 370 S.W.3d 347, 355 (Tenn. Ct. App. 2011) (citing *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006)); *In re Alexis L.*, 2014 WL 1778261 at *2. Because only one statutory ground is necessary for termination, we move directly to whether termination of Mother's parental rights is in the child's best interests.

## C. Best Interest of Carrington

Mother argues that the evidence did not clearly and convincingly demonstrate that it was in Carrington's best interest for Mother's parental rights to be terminated. The focus of the best interest analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Tennessee Code Annotated section 36-1-113(i) (2010) lists nine factors that courts may consider in making a best interest analysis. Not every factor enumerated in the statute applies to every case because the facts of each case can vary widely. *In re William T.H.*, No. M2013-00448-COA-R3-PT, 2014 WL 644730, at *4 (Tenn. Ct. App. Feb. 18, 2014). The juvenile court determined that it was in Carrington's best interest for Mother's parental rights to be terminated based on the following five statutory factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

. . . .

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

. . . .

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child.

Tenn. Code Ann. §§ 36-1-113(i)(1), (2), (4), (5), (8). We consider each factor relied upon by the trial court in turn.

The juvenile court found that Mother had not made such an adjustment of her circumstances, conduct, or conditions so as to make it safe and in the child's best interest to be in her home. *See* Tenn. Code Ann. § 36-1-113(i)(1). Mother stopped going to counseling sessions, abandoning attempts to address her behavioral and mental health issues. Her counselor, Ms. Beasley, testified that Mother had not made significant adjustments from 2009 to 2013, despite counseling and treatment during that period. Mother was hospitalized multiple times since the permanency plan was created in 2011, including one six-day period in 2011 because she was threatening to harm herself with razor blades. Mother was also admitted to Rolling Hills Treatment Center in 2012 where she was treated for "polysubstance dependence, depression, suicidal ideation, and [abuse of the drug Xanax] . . . ."

Additionally, Ms. Beasley testified that Mother has histronic personality disorder, which is "very, very, very difficult to treat . . . ." Individuals with histronic personality disorder tend to have dramatic personalities; intense, unstable relationships; attention-seeking behaviors; rapid shifting of emotions; and often demonstrate rash decision-making and suicide attempts. From 2009 to 2013 when Ms. Beasley treated Mother, Ms. Beasley saw "very little movement or change in . . . her emotions, the way she handled things, her depression, her anger." Although Mother is in remission on substance abuse issues, the evidence showed that she has not so adjusted her behavioral, mental health, or personality issues in order to provide a safe, stable home for Carrington.

The juvenile court also determined that Mother also failed to effect a lasting adjustment after reasonable efforts by DCS. *See* Tenn. Code Ann. § 36-1-113(i)(2). DCS provided a litany of services to Mother over the past ten years: "ongoing services through DCS and CASA, therapeutic visitation, services through Mule Town Network, Strengthening

Families Program, broker daycare, services through Maury Cares for Kids, services through Kids First, services through Strengthening Families, assistance with daycare, sex abuse counseling, Child Advocacy Center services, anger management, parenting, [ ], services through Arnell's Counseling, counseling and medication management through Centerstone, services through Tennessee Family and Child Alliance (TFCA), Quarterly Progress Reports and Foster Care Review Board meetings, Child and Family Team Meetings to develop permanency plans as well as financial assistance for counseling, groceries, and transportation." Even with all of these services, Ms. Beasley and the counselor service worker concluded that Mother has failed to effect a lasting adjustment. Mother has made commendable progress in recovering from substance abuse, but the evidence showed she continues to struggle with emotional and mental stability.

Next, the juvenile court found that there was no meaningful relationship between Mother and Carrington. *See* Tenn. Code Ann. § 36-1-113(i)(4). Mother claims the juvenile court erred in considering this factor because Mother had no opportunity to develop a meaningful relationship with Carrington because she was prohibited from visiting him unless he requested visitation.[4] We do have concerns about allowing a child of Carrington's age to be the sole decision-maker in whether visitation should occur. However, the lack of a meaningful relationship between Mother and Carrington is undisputed. Carrington has lived in foster care since December 21, 2009, and Mother has had no contact with him since at least 2012.

Tennessee Code Annotated section 36-1-113(i)(4) requires the court to determine whether parent and child have a meaningful relationship, not to analyze why such a relationship may or may not exist. *See In re Adoption of J.A.K.*, No. M2005-02206-COA-R3-PT, 2006 WL 211807, at *6 (Tenn. Ct. App. Jan. 26, 2006) (stating that the court is not to consider whether the mother should have another chance to establish a relationship with child, but rather, what effect termination would have on the child). Regardless of the wisdom of any visitation order, the absence of a meaningful relationship would significantly hinder Mother's ability to parent and care for Carrington. *See State Dep't of Children's Servs. v. D.G.B.*, No. E2001-02426-COA-R3-JV, 2002 WL 31014838, at *9 (Tenn. Ct. App. Sept. 10, 2002) (discussing the meaningful relationship factor in light of the Legislature's ultimate goal to return the child to his parent's care).

Moreover, the juvenile court determined that returning Carrington to Mother's care was likely to have a "detrimental/negative effect on the child's emotional, psychological, and

---

[4] It is unclear from the record whether Carrington's consent was always a condition to visitation with Mother.

medical condition." *See* Tenn. Code Ann. § 36-1-113(i)(5). Carrington's counselor, Mr. Walker, testified that Carrington has been diagnosed with reactive attachment disorder, attention deficit disorder, and oppositional defiant disorder. Reactive attachment disorder usually develops in young children whose basic attachment patterns have been severely disrupted so that they have trouble forming and sustaining future attachments. In order for Carrington to develop properly, Mr. Walker stated that Carrington needs "a home that is stable, and no matter how upset he gets, no matter how hard he tests the attachments, they don't break." Mr. Walker further testified that Carrington's behavioral problems arise and intensify when he is faced with "the threat of an impending move." During these periods, his behavior is "so off the charts the foster parents said they could not manage him." Mr. Walker testified that Carrington became oppositional and combative, while also becoming "extremely clingy to the foster parents . . . he knew, at some level, that he was at the brink of being moved."

Long-term foster care is disfavored by public policy and is seldom in the best interest of the child. *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *8 (Tenn. Ct. App. June 26, 2006). Here, Carrington has been in and out of foster care since April 2005. Carrington's counselor recommends that he be placed in a permanent living situation in order for his behavioral and emotional condition to improve. Although reunification with biological parents is always a goal, the best interest of the child is paramount. Carrington needs a safe, permanent home free of abuse and emotional instability.

Finally, the juvenile court found that Mother's mental and emotional status would prevent Mother from effectively caring for and parenting Carrington. *See* Tenn. Code Ann. § 36-1-113(i)(8). Mr. Walker testified that living with Mother, who suffers from histronic personality disorder, would be a home environment that "would be almost the exact opposite of what [Carrington] needs." If Carrington were to be under Mother's care, Mr. Walker testified that Mother's mental and emotional status would "reinforce his attachment disorder . . . because it would be such a yo-yo experience." Mr. Walker also testified that even visitations with Mother "would be disruptive to [Carrington]." The effect of Mother's mental and emotional status on Carrington would result in Carrington becoming "oppositional, uncooperative, rebellious, verbally and physically resist[ant] [to] any efforts to manage him, [ ], . . . resist[ant] [to] any direction being given to him . . . [and] virtually and completely uncooperative." In sum, the evidence showed that Mother's mental and emotional status would have a deleterious effect on Carrington's well-being.

As noted above, the list of statutory factors to consider in a best interest analysis is not exhaustive, and we do not need to "find the existence of each enumerated factor before [we] may conclude that [termination] is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Here, we conclude there is clear and convincing evidence

that the termination of Mother's parental rights is in the child's best interest. The evidence does not preponderate against the findings of the trial court.

### III. CONCLUSION

The juvenile court's judgment terminating Mother's parental rights to Carrington H. is affirmed. Costs of this appeal shall be taxed to Mother.

_____
W. NEAL McBRAYER, JUDGE