IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 28, 2015 Session

## DALE CRAFTON (ROBERTS) v. JAMES FREDERICK ROBERTS

**Appeal from the Circuit Court for Shelby County**
**No. CT00034307      Rhynette N. Hurd, Judge[1]**

_____

**No. W2015-00048-COA-R3-CV – Filed December 28, 2015**
_____

This appeal arises from post-divorce litigation between Dale Crafton Roberts ("Mother") and James Frederick Roberts ("Father"). Primarily at issue is the validity of the trial court's adoption of a modified permanent parenting plan recommended by its divorce referee. For the reasons stated herein, we vacate the modified permanent parenting plan that was adopted and remand for further proceedings that are consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which BRANDON O. GIBSON, and KENNY ARMSTRONG, JJ., joined.

James Frederick Roberts, Memphis, Tennessee, Pro se.

Leslie G. Coleman and Jason R. Ridenour, Memphis, Tennessee, for the appellee, Dale Roberts Crafton.

**OPINION**

**Background and Procedural History**

_____

[1] We note that prior to the entry of an order on October 1, 2012 by Judge Hurd, this case was presided over by Judge Kay S. Robilio.

The parties in this matter were divorced pursuant to a final decree of divorce entered by the Shelby County Circuit Court in August 2007. At the time of the divorce, there were two minor children born of the marriage.[2] Under the terms of the final decree, Father was designated as the primary residential parent for the parties' youngest child, whereas Mother was designated as the primary residential parent for the parties' oldest child. The subsequently entered permanent parenting plan provided that Father would share equally in the cost of the children's attendance at a local private school "[i]n lieu of the payment of child support." The plan further provided that Father's obligation to pay for the cost of the private school would cease when the children could no longer attend the private school due to their age; at such time, the plan contemplated that Father's child support obligation would be determined in accordance with the Child Support Guidelines.

The post-divorce litigation was set in motion by the June 18, 2010 filing of Mother's "Petition to Enjoin Father from Interfering with Babysitting Arrangements Made by Mother." The petition alleged that Father had picked the children up from Mother's residence during times when he was not supposed to be exercising parenting time. It further alleged that he had communicated directly with Mother's babysitter and that he had changed the times that the babysitter was to work without discussing same with Mother. On July 2, 2010, Father filed an answer to Mother's petition, as well as a counter-petition that sought to modify the parenting arrangements established pursuant to the final decree of divorce. Father's counter-petition alleged that Mother had displayed erratic behavior since the entry of the permanent parenting plan order and submitted that Father was the better parent to be designated the primary residential parent of both minor children. Although Father was represented by counsel when he filed his counter-petition, he later became unrepresented and proceeded *pro se* when his attorney encountered disciplinary problems. On July 9, 2010, Mother filed a petition for contempt against Father, asserting various bases on which Father should be held in both civil and criminal contempt of the trial court's orders. Shortly thereafter, on July 20, 2010, Mother filed her own petition for modification of the permanent parenting plan. The petition asserted that Father had shown an extreme level of favoritism towards the parties' youngest child, while exhibiting "disgust and aggression" towards the parties' oldest child. After outlining a number of alleged incidents of abuse committed by Father, Mother submitted that she should be designated as the primary residential parent for the children and that Father's parenting time should be supervised. In the alternative, Mother contended that it was in the children's best interests to limit Father's parenting time.

---

[2] Based on the statistical information provided in the record transmitted to us on appeal, we observe that the parties' oldest child reached the age of majority shortly before the filing of the most recent notice of appeal in this matter.

A hearing was held over several dates in July 2011. Although the hearing predominantly concerned matters pertaining to the residential parenting schedule and custody, with each party testifying as to their respective preferences for how the parenting plan should be restructured, the issues in Mother's petition for contempt were also addressed. During the course of the proceedings, an issue arose as to whether either party was in arrears on any of the financial obligations required pursuant to the parenting plan. In response to this issue, the trial judge stated as follows: "If there's a bookkeeping[] controversy, I send that to the referee. So right now let's s[t]ay with the parenting plan."

On July 11, 2011, despite the benefit of several hearing days, the trial court indicated that it was not prepared to make a final ruling as to any of the parenting issues between the parties. Instead, it ruled that Mother and Father should operate under a temporary parenting plan until further adjudication. The trial court's oral ruling, which was subsequently memorialized into a written order, provided that the parties would exercise parenting time on an alternating weekly schedule. The trial court stated that it would resume the custody hearing in September 2011.

When the hearing resumed on September 7, 2011, the trial court indicated at several points throughout the hearing that it intended to resolve the parenting issues with the entry of an order setting out the parties' parenting responsibilities. At one point, the trial court stated, "I want you to leave today with any loose ends tied up and an order in place that -- with an addendum, that provides the kind of comfort and caution that where you can feel a level -- a greater level of security." The trial court later went on to discuss various provisions that it stated should be included in a modified parenting plan. At one juncture, for example, the trial court stated: "In the parenting plan, make a note that both parents have to cooperate with the children's school administration in their suggestions since they have difficulty themselves working through a controversy." As illustrated by the following exchange between the trial court and Mother's counsel, the trial court contemplated that the basic arrangements provided for in the temporary parenting plan would continue into the future:

[Mother's counsel]: Your honor, could I ask your Honor a question too?

The Court: Yes.

[Mother's counsel]: I want to make sure I understand what your Honor is ordering is that the temporary plan that your Honor implemented will continue --
The Court: Yes.

[Mother's counsel]: -- is that right?

3

The Court: Yes.

[Mother's counsel]: And we are ordered to tweak the holidays --

The Court: Yes.

[Mother's counsel]: -- and to add some additional language in there about telephone access and that we're to try to come to a conclusion about what is owed in arrears?

The Court: Yes.

[Mother's counsel]: Is that --

The Court: And I think it can be reduced to a permanent parenting plan. We've had weeks that have passed and I think this unequivocally is something the Court could have and should have accepted when it was originally proposed to the Court by the psychologist. At the time it seemed ... and I wanted to be sure that the parents had further opportunity. But after the last report from the last psychologist, I'm convinced this is the best plan.

When the issue of unpaid financial obligations arose again, as it did in the July proceedings, the trial court remarked that it usually let the divorce referee handle such matters. Specifically, the trial court commented: "I don't get into bookkeeping on that score, that's where the referee comes in." The trial court reiterated this sentiment once more later in the hearing, stating as follows:

I'm going to have my referee attend to this controversy. If you all -- and when you're given the opportunity to talk with [Mother's counsel], if you can't agree on who owes what, then I'm going to have my referee be in on this one; that particular issue where he specifically -- appropriate for him to address.

. . . .

Now, if you are -- I'm going to assume that if there are bookkeeping controversies you'll set it with the referee.

As the hearing came to a close, the trial court directed the parties to work out the details of the parenting plan concerning holiday time and telephone communication. It then adjourned

4

the hearing and instructed the parties to return to court the following Friday to either present a parenting plan or to explain why they could not agree on the details of one. Having reviewed the record transmitted to us, we observe that a modified parenting plan was not entered within the weeks following the September 7, 2011 hearing date. As will be explained below, the parties dispute what actions the trial court took towards resolving the custody dispute that existed between them.

On October 13, 2011, Father filed a "Petition to Modify Child Support" and a "Motion for Relief from Void Judgment." Father's petition requested that the "Court/Referee" award child support in a manner consistent with the Child Support Guidelines. Father's motion, which also dealt with the subject of child support, asserted that the original parenting plan's child support provision was void and against public policy. Following the filing of Father's petition to modify child support, an order of reference was entered referring the matter to the Circuit Court's divorce referee for hearing.

On October 21, 2011, Mother filed a motion requesting that the trial court enter orders regarding the proceedings that occurred in July and September 2011. In pertinent part, Mother requested that the trial court (1) enter a modified parenting plan consistent with its previous oral ruling and (2) refer disputes over unpaid financial obligations to the divorce referee. Although there is not a transcript memorializing what transpired, the parties apparently appeared before the trial court on October 28, 2011. As is significant to this appeal, the parties disagree as to what occurred during this appearance before the trial court. Whereas Mother contends that the trial court referred all outstanding matters, including custody issues, to be addressed by the divorce referee, Father vehemently argues that only the financial matters were referred. Although there is no order in the record subsequent to the parties' October 28th court appearance memorializing the extent of what, if anything, was referred by the trial court to the referee as a result of that appearance, the parties subsequently filed memoranda outlining the issues that were supposedly referred. Mother filed her memorandum on November 14, 2011. Therein, she contended that the parties were instructed "to take all outstanding disputes, including those disputes pertaining to parenting, to the Divorce Referee for resolution." The text of Father's memorandum, which was filed three days later, did not dispute this assertion. In fact, the introduction section of Father's memorandum began as follows: "The Court in this matter has referred all outstanding issues in dispute to the Divorce Referee for hearing. The outstanding issues in dispute pertain to parenting and financial matters[.]" During his oral argument on appeal, Father stated that he had been "lost" and that he was "induced" to argue parenting issues in his memorandum in response to the statements made in Mother's memorandum. He denied that the parenting issues had, in fact, been referred to the divorce referee for hearing.

5

Proceedings eventually took place before the divorce referee on December 5, 2011, January 26, 2012, and June 18, 2012.[3] On February 27, 2012, prior to the last hearing date before the divorce referee, the State of Tennessee filed a "Notice of Title IV-D Services and Notice of Transfer to the Juvenile Court of Memphis and Shelby County, Tennessee." There is no dispute between the parties that, as a result of this notice, child support issues were transferred from the Circuit Court to the jurisdiction of the Juvenile Court.

At the close of the June 18, 2012 hearing before the divorce referee, the referee ruled that Mother should be designated as the primary residential parent for both minor children. When questioned by Father regarding what material change in circumstances warranted a changing of Father's primary residential parent status,[4] the referee responded as follows: "Well, I'm of the opinion that there should be only one primary residential parent. I'm still going to allow you-all to -- since you have equal time, I'm going to allow you to each claim one child during the year. Okay. I'm going to allow that." The referee later commented that Mother seemed to "be the more stable person to have that designation." Father filed a motion to appeal the divorce referee's ruling to the trial court on June 26, 2012.

The referee's ruling was later reduced to written findings and recommendations, and on July 31, 2012, they were filed with the trial court. It should be noted that the referee's findings and recommendations were presented as findings and recommendations of "the Special Master." Indeed, we note that on the same date that the referee's recommendations were filed with the trial court, the trial court entered an order appointing the divorce referee as a Special Master pursuant to Rule 53 of the Tennessee Rules of Civil Procedure. The order of reference purported to refer "all outstanding matters" to the divorce referee acting as a Special Master, including the construction of a permanent parenting plan. The order was entered *nunc pro tunc*, with a stated effective date of October 28, 2011.

Father filed objections to the referee's/Special Master's report on August 29, 2012, and on September 6, 2012, Mother filed a motion requesting that the trial court adopt the findings. The trial court ultimately adopted the referee's findings and recommendations through the entry of an order filed on October 1, 2012. Father filed a notice of appeal on October 31, 2012.

---

[3] On the December 5, 2011 hearing date, the referee primarily addressed matters pertaining to child support. On January 26, 2012, the referee conducted what was essentially a status conference. Custody issues were addressed at the June 18, 2012 hearing date.

[4] As discussed previously, Father was originally designated as the primary residential parent for the parties' youngest child.

On September 6, 2013, this Court entered an order noting that several issues appeared to remain unresolved from the trial court. In particular, we observed that Mother's June 18, 2010 petition concerning babysitting arrangements and her July 9, 2010 petition for contempt did not appear to be adjudicated. Although we provided an opportunity for Father to obtain the entry of a final judgment and directed that the trial court should transmit a supplemental record once one was obtained, we did not receive a supplement to the record within the timeframe established pursuant to our September 6 order. On October 9, 2013, having received no proof of entry of a final judgment from the clerk of the trial court, we dismissed Father's appeal without prejudice for lack of jurisdiction.

After the mandate issued, Father filed several pleadings with the trial court, asserting various perceived concerns. On April 25, 2014, he filed a "Motion to Resolve Outstanding Petitions for a Final Order." On July 9, 2014, Mother filed a response to Father's motion and requested that the trial court hold a status conference on the case in September 2014. The record indicates that a status conference was, in fact, held in September 2014 in accordance with Mother's request. Following the status conference, the trial court directed the parties to submit memoranda outlining the remaining issues that needed to be adjudicated. On November 21, 2014, after the parties had submitted memoranda identifying the outstanding issues in the case, the trial court entered its "Final Order Resolving Open Issues." Father subsequently filed a new appeal to this Court on December 19, 2014. On March 13, 2015, we entered an order indicating that one aspect of Mother's petition for contempt was left unresolved by the November 21, 2014 order. After the trial court entered an order resolving this issue on April 16, 2015, the present appeal ensued.

**Issues Presented**

On appeal, Father raises three primary issues for our review, which we have slightly restated as follows:

1.     Was the trial court correct when it allowed the divorce referee to hear the main issues of the case as a divorce referee without a controlling order of reference as a Special Master and then attempted to cure this defect with a retroactive *nunc pro tunc* order of reference appointing the divorce referee as Special Master?

2.     Was the trial court correct when it failed to vacate the original child support order that bars the parties from using the child support guidelines until the children finish the sixth grade?

7

3.      Was the trial correct when the Primary Residential Parent designation was changed from Father to Mother given all the testimony regarding her violent behavior?

As a separate issue for review, Mother asserts that she is entitled to recover her attorney's fees and costs associated with this appeal.

## Discussion

### *Modification of the Permanent Parenting Plan*

The primary issue in this appeal concerns the trial court's modification of the permanent parenting plan. In his brief, Father challenges the modification on two fronts. First, he raises procedural concerns incident to the trial court's appointment of the divorce referee as a Special Master. Second, he generally asserts that the modification of his primary residential parenting status failed to meet the required evidentiary threshold. These concerns more or less comprise Father's first and third stated issues for review. For the reasons that follow, we are compelled to vacate the trial court's order adopting the referee's recommended parenting plan.

As we have already noted, there is an absence of agreement as to what was referred to the divorce referee for hearing. Although Mother asserts that custody issues were properly referred to the referee, Father maintains they were not. Having reviewed the record transmitted to us, we note there are two orders in which the trial court referred matters to the divorce referee for hearing. The first order of reference is dated October 14, 2011 and was entered following the filing of Father's petition to modify child support. There does not appear to be any dispute between the parties that this order of reference pertained only to matters of child support, nor does the record permit us to reach any other conclusion. The second order of reference is dated July 31, 2012. The text of this order indicates that parenting issues were referred for a hearing, and it specifically appoints the referee to hear these issues as a Special Master pursuant to Rule 53 of the Tennessee Rules of Civil Procedure. Although the hearing before the referee was concluded before the entry of the July 31, 2012 order of reference, that order was entered *nunc pro tunc* to October 28, 2011. On appeal, Father takes issue with the trial court's attempt to give the July 2012 order of reference retroactive effect.

Although it is possible that the trial court referred all outstanding issues to be heard by the divorce referee when the parties appeared before it on October 28, 2011, the record does not provide support for this fact so as to justify the *nunc pro tunc* entry of the July 31, 2012 order. "The general rule is that to justify a nunc pro tunc order there must exist some

8

memorandum or notation found among the papers or books of the presiding judge, and a nunc pro tunc order will not be valid unless there is some such memorandum showing what judgment or order was actually made and these jurisdictional facts recited." *Gillespie v. Martin*, 109 S.W.2d 93, 94 (Tenn. 1937) (citation omitted). As our state Supreme Court has recently noted, the written notation or memorandum found must indicate "the intent of the trial court to enter the judgment on the earlier date." *Blackburn v. Blackburn*, 270 S.W.3d 42, 54 (Tenn. 2008) (citation omitted). Because the error justifying a *nunc pro tunc* entry must have been due to the mistake of the court and not the attorneys or parties, "the trial court should generally refer only to written notations or memoranda indicating the court's intent to enter the judgment on a specified earlier date." *Id.* at 55 (citations omitted). Here, there is simply an absence of such a notation or memorandum by the trial court indicating its intent to refer parenting disputes to the referee on October 28, 2011. Although Mother argues that Father's November 17, 2011 trial memorandum contains an admission that parenting issues were, in fact, referred to the referee, Father, a *pro se* litigant, has explained that he was "induced" to make such a comment and was simply responding to statements made in a previous memorandum by Mother that outlined the issues that she argued were supposedly referred. In any event, we fail to see how Father's statements could support the entry of a *nunc pro tunc* order. As our Supreme Court has explained, "[i]t is not enough that the parties believe that a judgment has been filed, there must be clear and convincing evidence that the court announced its judgment, and, but for clerical error or mistake, the judgment was not filed for entry." *Id.* at 50 (citation omitted). Here, there is no evidence in the record indicating that the trial court, on or before October 28, 2011, intended to refer all outstanding matters to the divorce referee for a Special Master hearing. We would thus agree with Father that the *nunc pro tunc* entry of the July 2012 order of reference was improper. Moreover, we fail to see how the referee could have, in good faith, delved into issues as a Special Master for which there was no controlling order of reference as contemplated by Rule 53.02 of the Tennessee Rules of Civil Procedure.

In her brief, Mother seems to suggest that even if we find that the referee exceeded his authority, Father was not prejudiced by the referee's actions. She argues that the parties were fully heard before the referee regarding the issues and concerns related to the parenting plan and notes that the trial court had full access to the transcripts of the referee's hearing. She further notes that the trial court conducted a hearing on the referee's report and that both parties had the opportunity to file and voice objections. Although it is true that Father was heard regarding the parenting plan and testified before the referee as to his parenting preferences, it is spurious to suggest that such facts mitigate the consequences of the referee's decision to act on matters for which there was no controlling order of reference. Because there was no controlling order of reference concerning custody issues at the time of the referee proceedings, there is no indication that Father was fairly put on notice that

custody matters would be heard by the referee.[5]   Indeed, we cannot infer that Father was fully prepared to litigate custody issues simply on account of the fact that the referee took proof on such issues.  Father has maintained throughout this appeal that parenting issues were never referred to the referee.  Under these circumstances, therefore, we fail to see how

---

[5] Although not technically necessary to our resolution of this appeal, we have serious concerns as to the propriety of the subject matter that was purported to be referred to the referee for hearing as a Special Master pursuant to the trial court's July 2012 order of reference.  It is our understanding of the law that referrals to a Special Master are "limited to collateral, subordinate, and incidental issues and the ascertainment of ancillary facts, while the main issues in controversy and the principles on which these issues are to be adjudicated must be determined by the trial court." *Frazier v. Bridgestone/Firestone, Inc.*, 67 S.W.3d 782, 784 (Tenn. Workers' Comp. Panel Oct. 19, 2001) (citations omitted).  Adjudicating a custody dispute is a great responsibility and solemn duty for the trial court, and we note that both parties in this case sought to alter the initial primary residential parent designations made incident to the divorce.  We fail to see how an issue concerning the modification of a primary residential parent designation could be deemed a "subordinate" or "collateral" issue such that it is amenable to referral to a Special Master.  Although our research has uncovered cases where custody matters were heard by a Special Master, we note that the propriety of the referrals in those cases did not appear to be at issue on appeal.  *See Everett v. Everett*, No. E2008-00472-COA-R3-CV, 2009 WL 1312925 (Tenn. Ct. App. May 12, 2009); *Bartley v. Bartley*, No. 03A01-9511-CV-00420, 1996 WL 469697 (Tenn. Ct. App. Aug. 20, 1996).  As an aside, despite the pronouncements in cases such as *Frazier*, we note that there appears to be a split within this Court as to whether a referral to a Special Master can include all issues in controversy.   In the recently issued opinion of *Hardin v. Hensley-Hardin*, No. E2014-01506-COA-R3-CV (Tenn. Ct. App. Dec. 18, 2015), the Eastern Section of this Court noted that the trial court "may refer all issues, including the main issue of controversy, without limitation and without abdicating its judicial authority to make the ultimate determination." *Id.*, slip op. at 11.  In another case from the Eastern Section, *Franklin v. DeKlein-Franklin*, No. E2007-00577-COA-R3-CV, 2008 WL 1901113 (Tenn. Ct. App. Apr. 30, 2008), this Court noted that "Rule 53.02, while authorizing a trial court to restrict the reference to particular issues, does not preclude a special master from addressing the entirety of the issues in a case." *Id.* at *8. Interestingly, notwithstanding such statements, both of the parties complaining about the referrals involved in *Hensley-Hardin* and *Franklin* were found to have essentially "waived" the issue.  *Hensley-Hardin*, No. E2014-01506-COA-R3-CV, slip op. at 11; *Franklin*, 2008 WL 1901113, at *9.  Although the *Hensley-Hardin* and *Franklin* decisions predicated their statements regarding Special Master referrals on the text of Rule 53 of the Tennessee Rules of Civil Procedure, we note that other judicial decisions have acknowledged a limitation on Special Master referrals despite the apparent breadth of the Rule.  As the *Frazier* decision stated:  "By Tenn. R. Civ. P. 53, a court may submit any matter to a special master.  Case law, however, both before and after the 1971 adoption of Rule 53, supports the . . . contention that such referrals are limited to collateral, subordinate, and incidental issues." *Frazier*, 67 S.W.3d at 784.  Indeed, in contrast to the statements in *Hensley-Hardin* and *Franklin*, other recent decisions out of the Western Section of this Court have continued to recognize that referrals to a Special Master should not include the main issues in controversy.  *See Peacher-Ryan v. Heirs at Law of Ruth James Gaylor*, No. W2013-02801-COA-R3-CV, 2015 WL 1598072, at *3 (Tenn. Ct. App. Apr. 9, 2015) (noting that not all matters can be referred to a Special Master); *Vraney v. Med. Specialty Clinic, P.C.*, No. W2012-02144-COA-R3-CV, 2013 WL 4806902, at *33-34 (Tenn. Ct. App. Sept. 9, 2013) (same).  Again, given our disposition herein, it is not necessary to the resolution of this case to determine whether a limitation exists on Rule 53 referrals or whether such a limitation would apply to custody determinations.  We find it prudent, however, to express our concerns about referring custody matters and to acknowledge the apparent split of authority within this Court on the interpretation and application of Rule 53.

the taint associated with the referee proceedings could somehow be remedied by the trial court's subsequent review of them.

We note that within the context of the referee's proceedings, there are points where uncertainty is displayed as to the nature of what is to be litigated. Towards the opening of the June 18, 2012 hearing before the divorce referee, for instance, Mother's counsel asserted that the trial court had referred all outstanding issues to the referee "for a determination, essentially as sort of a special master capacity." When Father subsequently remarked that Mother had attempted, through various pleadings, to take custody of the parties' youngest child away from him, the referee responded as follows: "Okay. But that's not the case this day. They are proposing 182.5 -- 182.5, and -- okay. So they're not trying to take away custody. We're not dealing with the custody issue at this point." Of course, mere moments later, Father's designation as primary residential parent of the parties' youngest child was put into issue.[6]

Given the absence of an order of reference from the trial court, the referee appeared to have relied on representations made by Mother's counsel as to what had been referred. Consider, for example, the following exchange that occurred towards the end of the June 18, 2012 hearing:

[Divorce Referee]: I'm trying to look at [the trial court's] order of reference.

[Father]: Because, Your Honor, is it --

[Divorce Referee]: Do you have a copy of it, either one of you?

[Mother's counsel]: I don't think she actually filed an official order of -- or entered an official order of reference.

[Father]: There is a --

---

[6] Although the trial court suggested that it intended to modify the parenting schedule during the course of the July 2011 proceedings, it did not, as far as we are able to discern, originally intend to alter its designations concerning primary residential parent status. On July 7, 2011, the trial court stated as follows:

> The law, as I understand it -- and we can talk about this later -- is that unless there is some kind of changed circumstances, you don't get into a battle over custody, which if you were represented by counsel might arguably be a position to be brought before the Court that there's no reason to change custody because there's no changed circumstance.

[Mother's counsel]: There is an order of reference as it relates to his -- now, he did a separate order of -- he filed a petition to modify child support after [the trial court] had referred the issue to you. But --

[Father]: Your Honor, I filed a -- with the child support office long ago.

[Mother's counsel]: There wasn't --

[Father]: Long ago.

[Mother's counsel]: There wasn't an official order of reference from [the trial court] to you.

[Father]: There is a motion --

[Mother's counsel]: That I'm aware of she. I mean, she may have entered something, Your Honor, but I'm not aware of it.

[Divorce Referee]: Okay. Mr. Ridenour --

[Mother's counsel]: Yes, Your Honor? Do you want me to cross-examine Mr. Roberts now or do you want to still address the issue of any outstanding motions?

[Father]: What about the motion for --

[Divorce Referee]: And the Court just referred this matter to divorce referee --

[Mother's counsel]: Resolving all outstanding issues related to the parenting plan.

[Divorce Referee]: Okay.

Assuming *arguendo* that none of the above concerns were an impediment to the trial court's review of the referee's written findings and recommendations, we must nonetheless vacate the trial court's October 1, 2012 order adopting them. As discussed below, we note that there is an absence of appropriate findings evidencing that Mother met the required evidentiary burden of proof for a modification of a permanent parenting plan changing primary residential parent status.

"[N]either trial nor appellate judges have any responsibility greater than to attempt to correctly adjudicate child custody disputes." *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983). Although "[a] custody decision, once made and implemented, is considered res judicata upon the facts in existence or those which were reasonably foreseeable when the decision was made," *Rigsby v. Edmonds*, 395 S.W.3d 728, 735 (Tenn. Ct. App. 2012) (citation omitted), parenting arrangements are not inviolate. Indeed, our statutes expressly provide that custody decisions and residential parenting schedules may be modified under appropriate circumstances. In Tennessee, a trial court must engage in a two-step analysis in order to modify custody in an existing parenting plan. *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *2 (Tenn. Ct. App. Dec. 27, 2012). First, the trial court must determine whether a material change in circumstances has occurred subsequent to the entry of the court's prior custody order. *Id.* (citing Tenn. Code Ann. § 36-6-101(a)(2)(B)). Second, the trial court must consider the factors outlined in Tennessee Code Annotated section 36-6-106(a) and determine whether the child's best interests are served by a modification of the existing custody arrangement. *Id.* (citation omitted).

In this case, there is a lack of findings evidencing that the trial court performed the two-step analysis required for a custody modification. First, there is not a finding of a material change in circumstance in either the referee's written report or the trial court's order adopting it. Second, there is an absence of an appropriate best interest analysis. Although the referee's report does conclude that designating Mother as the children's primary residential parent is in their best interests, there is no indication that the best interest factors in Tennessee Code Annotated section 36-6-106(a) were given any serious consideration. The referee simply concluded that "Mother seem[ed] to be the more stable person" and that the previous primary residential parent designations did "not benefit the children." No specific facts were cited to support any of these conclusions.

We note that pursuant to Rule 52.01 of the Tennessee Rules of Civil Procedure, trial courts must make findings of fact and conclusions of law to support their rulings. In relevant part, that rule provides as follows:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

Tenn. R. Civ. P. 52.01. Factual findings are not only mandated by Rule 52.01, but they are also required pursuant to the statute governing custody modification. *See* Tenn. Code Ann. §

13

36-6-101(a)(2)(B)(i) (2014) ("In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination.").

As we have stated previously, because custody determinations often hinge on subtle factors, findings of fact are particularly important in cases that involve the custody and parenting schedule of children. *Pandey v. Shrivastava*, No. W2012-00059-COA-R3-CV, 2013 WL 657799, at *4 (Tenn. Ct. App. Feb. 22, 2013) (citation omitted). Indeed, the best interest of a child is a "'fact-intensive issue,'" *id.* at *5 (citing *Hardin*, 2012 WL 6727533, at *5), and the absence of appropriate findings can significantly inhibit our ability to review the propriety of a modification decision. Such is true in this case. There are simply no factual findings that provide insight as to why the trial court reached the decision that it ultimately did. This alone compels us to vacate the trial court's October 1, 2012 order adopting the referee's recommendations.

We are not without regret in acknowledging that this custody dispute has dragged on far too long. Given the circumstances of the case, however, we must remand this matter to the trial court for further proceedings to adjudicate the parties' petitions concerning custody and modification of the original permanent parenting plan. We note that "events and lives have not stood still while this custody dispute has been in the courts." *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4 (Tenn. Ct. App. July 21, 1999). The parties' oldest child is no longer a minor, and there very well may be other circumstances that have changed significantly between the parties over the course of the past several years. As such, the trial court should endeavor to ascertain and give effect to the parties' circumstances as they exist as of the date of the remand proceedings. *See Kathryne B.F. v. Michael B.*, No. W2013-01757-COA-R3CV, 2014 WL 992110, at *7 (Tenn. Ct. App. Mar. 13, 2014) (citing *In re C.W.*, 420 S.W.3d 13, 22 (Tenn. Ct. App. 2013)). Unless the trial court exercises its discretion to enter a new temporary plan, the parties shall exercise parenting time with the remaining minor child on an alternating weekly basis[7] pending the final resolution of this case.

### *Child Support*

In addition to litigating the validity of the modified parenting plan, Father challenges the propriety of the original child support order that was entered by the trial court. We conclude that we are without jurisdiction to review the merits of this issue. As we previously noted, child support issues were transferred to Juvenile Court after this post-divorce litigation

---

[7] We note that the trial court previously ordered the parties to alternate parenting on a weekly basis in its July 2011 temporary parenting order.

commenced.[8]  Because Father has appealed an order of a court that does not currently have jurisdiction over child support, we conclude that we are without jurisdiction to entertain his grievances within the context of this appeal.

### *Attorney's Fees*

The last issue for our consideration is Mother's request to recover her attorney's fees and costs associated with this appeal.  In her brief, although Mother cites to the general standard by which this Court should determine whether to award her attorney's fees, she fails to cite to the actual authority on which she bases her request for attorney's fees.  "Tennessee follows the American rule providing that litigants are responsible for their own attorney's fees absent a statute or agreement between the parties providing otherwise."  *Owens v. Owens*, No. M2012-01186-COA-R3-CV, 2013 WL 3964793, at *6 (Tenn. Ct. App. July 30, 2013) (citation omitted).  Mother's failure to cite any authority specifically supporting her request for attorney's fees constitutes a waiver of the issue. *See Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006).

### Conclusion

The trial court's order adopting the referee's written findings and recommendations is hereby vacated.  This cause is remanded to the trial court to conduct further proceedings as are necessary to adjudicate the parties' petitions relating to the custody and parenting schedule of the remaining minor child.  Proof should be taken to evaluate the circumstances of the parties as they exist as of the date of the remand proceedings.  Any orders that are entered modifying the original permanent parenting plan should contain appropriate findings of fact and conclusions of law in accordance with Rule 52.01 of the Tennessee Rules of Civil Procedure. Costs of this appeal are assessed one-half against the Appellee, Dale Crafton Roberts, and one-half against the Appellant, James Frederick Roberts, for all of which execution may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE

---

[8] The State of Tennessee filed a "Notice of Title IV-D Services and Notice of Transfer to the Juvenile Court of Memphis and Shelby County, Tennessee" on February 27, 2012.  Moreover, we note that Father acknowledged on appeal that child support issues were transferred to Juvenile Court.